# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ROBERT J. GERHARDT,

      Plaintiff,

vs.                                  No. CIV 15-0797 JB/LAM

VINCENT MARES, Executive Director,
New Mexico Racing Commission;
NEW MEXICO RACING COMMISSION;
DAVID KEITER, Steward, New Mexico
Racing Commission; ROBERT M. DOUGHTY, III,
Commissioner; BEVERLY BOURGUET,
Commissioner; JERRY COSPER, DVM,
Commissioner; GAYLA D. MCCULLOCH,
Commissioner; RAY WILLIS, Commissioner;
ROSCOE WOODS, Assistant Attorney General;
JOHN DOE(S) 1-5, New Mexico Racing Commission,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Defendant Roscoe Woods' Motion to Dismiss Amended Complaint, filed October 16, 2015 (Doc. 29)("Woods Motion"); (ii) the Racing Commission Defendants' Motion to Dismiss, filed October 28, 2015 (Doc. 31)("Commission Motion"); and (iii) the Plaintiff's Motion for Leave to File Sur-Reply to Defendant Woods' Reply in Support of Motion to Dismiss, filed November 24, 2015 (Doc. 38)("Surreply Motion"). The Court held a hearing on December 18, 2015. The primary issues are: (i) whether the Court should grant Plaintiff Robert J. Gerhardt's Surreply Motion and allow him to file a surreply to Reply Memorandum of Law in Further Support of Roscoe Woods' Motion to Dismiss Amended Complaint, filed November 16, 2015 (Doc. 33)("Woods Reply"); (ii) whether qualified immunity bars Gerhardt's claims against Defendant Roscoe Woods, an

Assistant Attorney General for the State of New Mexico, who represented Defendant New Mexico Racing Commission (the "Racing Commission") and who set up a settlement conference between Gerhardt and the other Defendants; (iii) whether Gerhardt has sufficiently alleged a claim against Woods for civil conspiracy under rule 12(b)(6) of the Federal Rules of Civil Procedure; (iv) whether ripeness, abstention under <u>Younger v. Harris</u>, 401 U.S. 37 (1971)("<u>Younger</u> abstention"), the Declaratory Judgment Act, or absolute quasi-judicial immunity bar Gerhardt's federal claims against the remaining Defendants; and (v) whether sovereign immunity and the New Mexico Tort Claims Act, N.M. Stat. Ann. 1978 §§ 41-4-1 to -30 ("NMTCA"), bar Gerhardt's state claims against the remaining Defendants.  First, the Court grants Gerhardt's Surreply Motion to allow Gerhardt to clarify his arguments.  Second, the Court concludes that qualified immunity bars Gerhardt's claims against Woods.  Third, the Court would grant the Woods Motion even if qualified immunity did not apply, because Gerhardt fails to state a claim under rule 12(b)(6).  Fourth, the Court concludes that ripeness and quasi-judicial immunity, but not <u>Younger</u> abstention or the Declaratory Judgment Act, bar Gerhardt's federal claims against the remaining Defendants.  Finally, the Court concludes that sovereign immunity and the NMTCA bar Gerhardt's state-law claims against the remaining Defendants.  The Court will thus grant the Surreply Motion, the Woods Motion, and the Commission Motion.

## **<u>FACTUAL BACKGROUND</u>**

The Court takes its facts from the Complaint, as it must when ruling on a motion under rule 12(b)(6) of the Federal Rules of Civil Procedure.  <u>See</u> Amended Complaint for Damages for Constitutional Violations, Prima Facie Tort and Civil Conspiracy, filed October 9, 2015 (Doc. 28)("Complaint").

Gerhardt owns a racehorse known as Three Wild Dreams.  See Complaint ¶ 16, at 3.

Three Wild Dreams was registered to compete in a race meet on May 24, 2014, at the Ruidoso

Downs Race Track in Ruidoso Downs, New Mexico.  See Complaint ¶ 14, 16, at 2-3.  The purse

value of this race was nearly one million dollars.  See Complaint ¶ 17, at 3.  Defendant David

Keiter, the race's presiding steward,[1] "scratched"[2] Three Wild Dreams from the race moments

before it began.  Complaint ¶¶ 18-19, at 3.  Keiter acted "under the authority and specific

direction of Vincent Mares, Executive Director of the" Racing Commission.  Complaint ¶ 20, at

3.

Keiter stated that he scratched Three Wild Dreams because of Gerhardt's failure to

comply with "Rule 15.2.5.12(B) (the 'Breed Certificate Rule')," which states that "[a] horse shall

be ineligible to start in a race when its breed registration certificate is not on file with the racing

secretary."  Complaint ¶¶ 21-22, at 3.  The racing secretary[3] at Ruidoso Downs had copies of

Three Wild Dreams' breed registration certificate on file instead of the original version.  See

Complaint ¶ 24, at 3.

"On or about May 24, 2014, David Keiter, acting in consort with Vincent Mares,

interpreted the Breed Certificate Rule to require the 'original' Breed Certificate to be on file at a

---

[1]Section 60-1A-2 of the Horse Racing Act defines "steward" as "an employee of the commission who supervises horse races and oversees a race meet while in progress, including holding hearings regarding licensees and enforcing the rules of the commission and the horse racetrack."  N.M. Stat. Ann. 1978 § 60-1A-2(GG).  One of the stewards' duties is conducting hearings on complaints brought on the stewards' motion, or on receipt of a complaint from an official or third party.  See 15.2.1.9(B)(2)(a) NMAC.

[2]A "scratch" is "the act of withdrawing an entered horse from a contest after the closing of entries." 15.2.5.9(B)(1) NMAC.

[3]A "racing secretary" is responsible for creating each day's racing card -- the list of horses eligible to race.  See Ruidoso Racing Secretary Fired, Amarillo Globe News (Sept. 13, 2000), http://amarillo.com/stories/2000/09/13/spo_ruidoso.shtml#.Vp-3CEbYgeB.

race location on race day."  Complaint ¶ 25, at 3-4.  The Racing Commission had not enforced the Breed Certificate Rule "in recent history when two live races were ongoing."  Complaint ¶ 26, at 4.  The Racing Commission did not scratch any horses during races within the same event on May 22-23, 2014.  See Complaint ¶ 28, at 4.

"Leasa Johnson, an investigator with the NMRC [New Mexico Racing Commission], was present at the Ruidoso Downs races on May 24, 2014."  Complaint ¶ 30, at 4.  Johnson inquired into the horse scratches on May 24, 2014, and Keiter advised her that he was enforcing the Breed Certificate Rule.  See Complaint ¶ 31, at 4.  Johnson expressed concern, because the Racing Commission had not enforced the "original" certificate requirement in recent history and the Racing Commission was not enforcing it consistently to all competitors.  See Complaint ¶¶ 32-33, at 4.  "Based on the horses scratched, it appears that the NMRC was targeting horses trained by trainer John Stinebaugh."  Complaint ¶ 34, at 4.  The Racing Commission did not enforce the requirement until the third day of the Ruidoso Downs meet and did not apply the originals requirement to every horse during the three-day Ruidoso Downs meet.  See Complaint ¶¶ 35, 39 at 4, 5.  The Racing Commission provided only "select owners and trainers" with advance notice that it would begin enforcing the "implied" Breed Certificate Rule's "original" requirement.  Complaint ¶¶ 37, 43, at 5-6.

Gerhardt filed an appeal with the Racing Commission regarding the improper scratch on or about May 30, 2014.  See Complaint ¶ 45, at 6.  The Racing Commission appointed Leann Warbelow as the hearing officer, and she held a hearing on several similar cases on November 20, 2015.  See Complaint ¶¶ 46-47, at 6.  "Lonnie Barber, Director of the SunRay Park Race Track for eleven years and former president of the Horseman's Association for fifteen years testified during the NMRC hearing that the NMRC had not enforced the original certificate

requirement of the Breed Certificate Rule in the past."  Complaint ¶ 40, at 5.  Warbelow issued her initial report and recommendation to the Racing Commission (the "Initial Recommendation") on December 16, 2014.  <u>See</u> Complaint ¶ 102, at 13.  She found that the scratch "shows a lack of impartiality and is inconsistent with the statutory directive of the Horse Racing Act that rules of the Commission be 'construed to ensure that horse racing in New Mexico is conducted with fairness.'"  Complaint ¶ 48, at 6.

On March 12, 2015, the Racing Commission voted to take the Warbelow's decision "under advisement."  Complaint ¶ 50, at 6.  On July 8, 2015, the Racing Commissioners (Robert M. Doughty III, Beverly Bourguet, Jerry Cosper, Gayla D. McCulloch, and Ray Willis) and Woods set up a "settlement meeting" with "the primary purpose of assessing the strength of Plaintiff's case."  Complaint ¶ 106, at 14.  Woods had no authority or intent to resolve the issue, and used the meeting "solely to gather information by which to influence and/or change the hearing officer's decision."  Complaint ¶¶ 108-109, at 14.  On July 22, 2015, the Racing Commissioners held a meeting, at least in part to discuss Gerhardt's claims.  <u>See</u> Complaint ¶ 110, at 14.  They ignored the relevant regulations, which required them to discuss the issue in an open meeting.  <u>See</u> Complaint ¶¶ 111-112, at 14-15.  "Based on information extracted during a settlement meeting, Defendant Commissioners acted to 'remand' Plaintiff's matter for further examination.  No explanation was provided as to how such process was to proceed or the reasons/purposes for a remand."  Complaint ¶ 113, at 25.  The Racing Commission has not taken any further action on Gerhardt's claims.  <u>See</u> Complaint ¶ 114, at 15.

## PROCEDURAL BACKGROUND

Gerhardt filed his Amended Complaint on October 9, 2015.  See Complaint at 1.  His Complaint targets Woods,[4] the Racing Commission, its Racing Commissioners, Keiter (its steward), Mares (its executive director), and five unidentified Racing Commission employees.  See Complaint ¶¶ 5-9, 101, 107-109, at 2, 13-14.  The Complaint appears to allege: (i) violations of the Fourteenth Amendment to the Constitution of the United States' Due Process Clause; (ii) violations of the Fourteenth Amendment's Equal Protection Clause; (iii) a prima facie tort under New Mexico state common law; and (iv) state common-law conspiracy.  See Complaint ¶¶ 1-124, at 1-17.  Gerhardt seeks: (i) a declaration that the Defendants violated his right to due process; (ii) a declaration that the Defendants violated his right to equal protection under the law; (iii) attorney's fees and costs; (iv) a "declaration that the actions of identified Defendants described in this Complaint establishes [sic] a pattern and practice of the NMRC to violate its own governing laws, regulations, policies and practices"; (v) "[j]udgment in favor of Plaintiff on each of his Causes of Action"; (vi) "[g]eneral compensatory damages according to proof"; (vii) punitive damages; (viii) post-judgment interest; and (ix) "[a]ny and all other relief that may be appropriate."  Complaint ¶¶ 1-9, at 17-18 (listing requested relief).

### 1.    The Woods Motion.

Woods filed his motion to dismiss on October 16, 2015.  See Woods Motion at 1.  Woods sums up his argument:

---

[4]The Complaint does not explain whether it targets Woods in his official capacity, his individual capacity, or both.  See Woods Motion at 8.  The Court will presume, as Woods does, that Gerhardt sues him in both capacities for the purpose of describing the procedural background.  See Woods Motion at 8 (citing James v. Argeys, 2015 WL 881691, at *3 (D. Colo. Feb. 26, 2015)(Shaffer, J.)("[W]here the Amended Complaint is not completely clear, the court will presume that Defendant Argeys has been sued both in his official and individual capacities[.]")).

Plaintiff's sole cause of action against Mr. Woods is a claim for civil conspiracy. Mr. Woods, however, is protected from suit by the immunity afforded by the Eleventh Amendment to the United States Constitution. Plaintiff's claims against Mr. Woods are further barred by the New Mexico Tort Claims Act. Additionally, Mr. Woods enjoys qualified immunity for acts undertaken in the course of his duties as an Assistant Attorney General, and Plaintiff fails to allege any facts that would defeat such immunity. Finally, even taking all of the Amended Complaint's factual allegations as true, the Amended Complaint fails to state a claim upon which relief can be granted against Mr. Woods.

Woods Motion at 2.

First, Woods argues that sovereign immunity bars Gerhardt's claim against him in his official capacity. See Woods Motion at 9-13. He explains that the NMTCA creates only limited exceptions to the state's Eleventh Amendment immunity. See Woods Motion at 10-11. These exceptions, he says, apply only when the plaintiff brings suit in the state district courts. See Woods Motion at 11 (citing N.M. Stat. Ann. 1978 § 41-4-18(A)("Exclusive original jurisdiction for any claim under the Tort Claims Act shall be in the district courts of New Mexico.")); Bishop v. John Doe 1, 902 F.2d 809, 810 (10th Cir. 1990). Moreover, Woods adds, New Mexico "has not waived its sovereign immunity in any forum with respect to claims for civil conspiracy." See Woods Motion at 12 (emphasis in original).

Second, Woods contends that qualified immunity shields him from Gerhardt's civil conspiracy claim. See Woods Motion at 12-15. He notes that Gerhardt fails to allege even that he acted under color of law. See Woods Motion at 12. He also argues that his participation in the settlement conference did not violate any constitutional rights, much less any clearly established rights. See Woods Motion at 15. He concedes that Gerhardt "is entitled to have his appeal of the Steward's decision reviewed by the Racing Commission," but adds that Gerhardt "fails to allege that the Commission has refused to consider his appeal." Woods Motion at 15.

Finally, he attacks Gerhardt's civil conspiracy claim under rule 12(b)(6).  See Woods

Motion at 15-16.  He states that "[p]articipating in a settlement discussion is not actionable, in

tort or otherwise; nor is attending a settlement meeting to learn about an adversary's position, or

to "gather information," a legally cognizable wrong.  Woods Motion at 15-16.  Woods asserts

that the rest of Gerhardt's Complaint offers only

> robotic statements along the lines that Mr. Woods acted 'to conspire and deprive
> Plaintiff of his constitutional rights to due process and equal protection under the
> law,' Amended Complaint ¶ 101, acted "to further deprive Plaintiff of his
> property interests and further the harm caused by procedural violations of NMRC
> employees," *id.* ¶ 107, and also "combined" with other Defendants "to engage in a
> civil conspiracy that was furthered by overt acts," *id.* ¶ 116.

These allegations, he contends, are exactly the sort of "formulaic recitation of the elements of a

cause of action" that federal courts routinely reject.  Woods Motion at 16 (quoting Bell Atlantic

Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

Gerhardt responded on October 30, 2015.  See Plaintiff's Response to Defendant Roscoe

Woods' Motion to Dismiss Amended Complaint, filed October 30, 2015 (Doc. 32)("Woods

Response").   Gerhardt asserts that, despite his Complaint's reference to the NMTCA, see

Complaint ¶ 2, at 1, Woods' sovereign immunity arguments are irrelevant.  See Woods Response

at 6.  Gerhardt states that Woods conspired with other state actors to violate "his constitutional

right to equal protection under the law as applied to state actors via 42 U.S.C. § 1983."  Woods

Response at 6.  Although the Woods Response is difficult to follow, Gerhardt seems to argue that

Woods' participation in the settlement conference was merely one part of a greater conspiracy

among the defendants to violate Gerhardt's federal constitutional rights.  See Woods Response at

8-9.  He contends that Woods violated these rights, in part, by "afford[ing] an unfair advantage

to other individuals in violation of the equal protection clause."  Woods Response at 9.

Gerhardt also counters Woods' argument that he fails to allege any state action.  See Woods Response at 10.  He notes that, although he did not use "the magic words advocated by defense counsel," he "identified each Defendant as a state employee" and pled other facts that demonstrate that Woods acted under color of state law.[5]  Woods Response at 10.  He notes that Woods "had no authority to actually settle Plaintiffs [sic] claims when hosting [the settlement] meeting, nor had he requested any," arguing that this fact demonstrates Woods' bad faith. Woods Response at 11.

Gerhardt next contends that Woods is not entitled to qualified immunity.  See Woods Response at 13-14.  He continues to argue that Woods acted under color of law.  See Woods Response at 13 (citing Jojola v. Chavez, 55 F.3d 488 (10th Cir. 1995)("[S]tate employment is generally sufficient to render the defendant a state actor[.]")).  Gerhardt cites state regulations and cases to show that his right "to engage in his chosen profession" was clearly established on May 24, 2014.  Woods Response at 16 (citing Stinebaugh v. N.M. Racing Comm'n, No. 32,840, 2015 WL 4874288 (N.M. Ct. App. July 9, 2015)).  See State Racing Comm'n v. McManus, 1970-NMSC-134, ¶ 19, 476 P.2d 767, 771 (noting that a license "is not a vested right within the meaning of the due process clause of the state and federal constitutions," but recognizing that a jockey has "a right to engage in his chosen profession").

Gerhardt concludes by discussing how the alleged conspiracy's actions violated his constitutional rights.  See Woods Response at 16-18.  He says that the Defendants collectively created new regulations, reinterpreted old regulations, and implemented them selectively.  See

---

[5]Gerhardt also argues that Woods acknowledges "that its acts were taken in the course of his state employment and under color of law" by "raising a qualified immunity argument." Woods Response at 10.  The Court sees this logic as too unfair to civil rights defendants.  It does not seem to allow for any defendant to argue that he did not act under color of law and, if unsuccessful, then seek the protection of qualified immunity.

Woods Response at 17.   He also challenges the adequacy of New Mexico's procedural protections as applied to him.  See Woods Response at 17.  He notes that he received a hearing only after his deprivation, that the hearing did not occur "in a 'meaningful time and in a meaningful manner,'" and that Woods was aware of and involved in these violations.   Woods Response at 17.  Finally, he argues that the Court should grant him leave to amend his Complaint if the Court finds it inadequate.  See Woods Response at 20.

Woods replied on November 16, 2015.   See Woods Reply at 1.   Woods begins by summarizing his primary points:

- Sovereign immunity bars his lone claim against Mr. Woods, to the extent that claim is raised against Mr. Woods in his official capacity;

- Qualified immunity mandates dismissal of Plaintiff's claim against Mr. Woods, to the extent that claim is raised against Mr. Woods in his individual capacity[; and]

- The Amended Complaint's only allegation of fact regarding Mr. Woods is that he participated in a settlement discussion with Plaintiff's attorney and did so for the sole purpose of "gathering information," an allegation that cannot sustain Plaintiff's civil conspiracy claim.

Woods Reply at 1-2.  Woods argues that Gerhardt's sovereign immunity argument ignores

the salient aspects of the sovereign immunity analysis in this case: that our law requires an express waiver or abrogation of the State's sovereign immunity (regardless of whether Defendants conspired to inflict a constitutional or common-law injury on Plaintiff), that no such abrogation or waiver has been established, and therefore that sovereign immunity shields Mr. Woods from this lawsuit.

Woods Reply at 3.  He thus explains that his sovereign immunity defense rests on the absence of a legislative exception for Gerhardt's suit.  See Woods Reply at 3.  He notes that Gerhardt now sues him "only for engaging in a conspiracy to violate vaguely described constitutional rights, and not a conspiracy to commit tortious acts."   Woods Reply at 4.  Woods contends that, regardless of whether Gerhardt sues for a conspiracy under federal or state law, "the same

prerequisites apply before the State or its officials can be sued in federal court." Woods Reply at 4.

Woods then repeats his arguments on qualified immunity. See Woods Reply at 5-8. He emphasizes that a plaintiff must do more than identify a constitutional right in the abstract and allege that the defendant has violated it. See Woods Reply at 6 (citing Hilliard v. City and Cty. of Denver, 930 F.2d 1516, 1518 (10th Cir. 1991)). He asserts that the Complaint never ventures beyond "numerous generic invocations of 'due process,' 'equal protection,' and 'property interests[.]'" Woods Reply at 7. He again questions the conspiracy claim: "Exactly what 'machinations' did Mr. Woods and the other Defendants undertake in furtherance of their apparently vast conspiracy against Plaintiff and his sorrel gelding? The Court, Mr. Woods, and the other Defendants are left to guess, because the Amended Complaint offers no explanation." Woods Reply at 10. Woods concludes by attacking Gerhardt's request that the Court attribute any wrongdoing committed by any other defendant to Woods. See Woods Reply at 11. He states that Gerhardt "cannot use his Response to introduce new allegations that he failed to include in his Amended Complaint." Woods Reply at 11.

Gerhardt requested leave to file a surreply on November 24, 2015. See Surreply Motion at 1. He explains that a surreply "allows a non-moving party the opportunity to respond to new materials or new legal arguments briefed for the first time in a movant's reply." Surreply Motion at 1. Woods, he says, raised two new arguments: that he is immune from suit in his individual capacity as an arm of the State of New Mexico and that his Eleventh Amendment immunity applies to Gerhardt's § 1893 claim. See Surreply Motion at 2. Gerhardt also cites to the "complexity of this case and the defenses raised." Reply Motion at 2.

Gerhardt's proposed surreply responds to Woods' "new" argument that "he is immune from suit in his individual capacity because he is an 'arm' of the state and, thus, he enjoys the same immunity from a 42 U.S.C. § 1983 claim that a state enjoys." Plaintiff's Sur-Reply to Defendant Roscoe Woods' Motion to Dismiss at 1, filed November 24, 2015 (Doc. 38-1)("Surreply").[6] Although the Surreply is confusing, Gerhardt appears to argue that Woods cannot benefit from sovereign immunity when sued in his individual capacity. See Surreply at 2. The bulk of the Surreply repeats Gerhardt's arguments about state action and the alleged conspiracy. See Surreply at 3-4.

Woods opposes the Surreply Motion. See Defendant Roscoe Woods' Response in Opposition to Plaintiff's Motion for Leave to File Sur-Reply, filed December 10, 2015 (Doc. 40)("Surreply Response"). Woods contends that: (i) his reply brief did not raise any new arguments; and (ii) the Surreply "simply restates contentions that Plaintiff already has offered in his response brief." Surreply Response at 2. He concludes that "[t]his action is a straightforward, albeit meritless, Section 1983 and state-law tort suit, and Defendants have raised straightforward legal bases for dismissal." Surreply Response at 5.

**2.    The Commission Motion.**

The remaining Defendants (the "Racing Commission Defendants") moved to dismiss the Complaint on October 28, 2015. See Commission Motion at 1. They raise seven primary arguments. See Commission Motion at 6-13. First, they contend that the case is not ripe, because: (i) the question whether Gerhardt complied with the Racing Commission's regulations does not present purely legal issues; (ii) awaiting the conclusion of the Racing Commission's proceedings would allow for a more developed record; (iii) the delay will not cause Gerhardt any

---

[6]As discussed in greater detail below, the Court grants the Surreply Motion. It will discuss the Surreply itself here to collect the parties' arguments in a single space.

hardship because there is no ongoing impact; (iv) there is "an ongoing administrative proceeding that is judicial in nature"; and (v) the state courts provide an adequate forum because Racing Commission decisions are subject to state judicial review.  Commission Motion at 6-7.

Second, the Racing Commission Defendants argue that the Court must abstain from hearing this constitutional claim during an ongoing state proceeding under <u>Younger</u> abstention. <u>See</u> Commission Motion at 8.  They explain that there is an ongoing administrative proceeding that is judicial in nature, that the issue involves important state interests, and that the Racing Commission's proceedings, in conjunction with appeal to the state courts, are adequate to hear Gerhardt's claims.  <u>See</u> Commission Motion at 8-9.  They acknowledge that the doctrine does not apply "in cases of proven harassment or prosecutions taken in bad faith or other extraordinary circumstances where irreparable injury can be shown," but contend that a plaintiff must set forth "more than mere allegations of bad faith or harassment."  Commission Motion at 9.

Third, the Racing Commission Defendants assert that the Court should exercise its discretion under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, to decline to grant any declaratory relief.  <u>See</u> Commission Motion at 9-10.  They cite <u>Public Service Commission of Utah v. Wycoff Company, Inc.</u>, 344 U.S. 237 (1952), stating that it held that "the declaratory judgment procedure will not be used to preempt and prejudice issues that are committed for initial decision to an administrative body or special tribunal, any more than it will be used as a substitute for statutory methods of review."  344 U.S. at 247.

Fourth, the Racing Commission Defendants contend that the Racing Commission is immune from suit for damages under the Eleventh Amendment.  <u>See</u> Commission Motion at 10-11.  They note that Eleventh Amendment protections apply to both states and state agencies.  <u>See</u>

Commission Motion at 11 (citing <u>Hans v. Louisiana</u>, 134 U.S. 1 (1890), and <u>Edelman v. Jordan</u>, 415 U.S. 651, 662-63 (1974)).  The Racing Commission, they assert, is a regulatory agency that state statute creates.  <u>See</u> Commission Motion at 11 (citing N.M. Stat. Ann. 1978 § 60-1A-3).

Fifth, the Racing Commission Defendants argue that they are entitled to absolute immunity, because they perform quasi-judicial functions.  <u>See</u> Commission Motion at 11.  They state that this category includes "hearing officials, executive officials that initiate administrative proceedings, and agency attorneys participating in the administrative proceeding."  Commission Motion at 11.  They contend that the Court applied this same formula to the Racing Commission in <u>Simon v. Taylor</u>, 981 F. Supp. 2d 1020 (D.N.M. 2013)(Browning, J.).  They argue that, by extension, the same absolute immunity applies to the Racing Commission's individual members.  <u>See</u> Commission Motion at 12.  Woods' "information gathering," for example, allegedly "suggests nothing other than a prosecutorial role for the Racing Commission."  Commission Motion at 12.

Sixth, the Racing Commission Defendants contend that Gerhardt has failed to state a claim for civil conspiracy to deprive him of his constitutional rights.  <u>See</u> Commission Motion at 13.  They argue that they should be absolutely immune from Gerhardt's civil conspiracy claim, because: (i) they perform quasi-judicial functions; (ii) quasi-judicial immunity is analogous to prosecutorial immunity; (iii) prosecutors are absolutely immune if their participation in a conspiracy consists of otherwise immune acts.  <u>See</u> Commission Motion at 13.

Seventh, the Racing Commission Defendants argue that Gerhardt's prima facie tort and civil conspiracy claims are "barred by the Tort Claims Act," because "there has been no waiver of immunity for this tort."  Commission Motion at 13.

Gerhardt responded on November 16, 2015.  See Plaintiff's Response to New Mexico Racing Commission Defendants' Motion to Dismiss Amended Complaint, filed November 16, 2015 (Doc. 35)("Commission Response").  Gerhardt challenges the Racing Commission Defendants' argument that he failed to exhaust his administrative remedies.  See Commission Response at 4.  He explains that the Racing Commission's remand "does nothing but remand the matter back to the hearing officer[7] for 'further review.'  It offers no direction, it points to no errors or deficiencies in the hearing officer's previously tendered report and sets out no path to resolution."  Commission Response at 4.  He contends that there is no statutory exhaustion requirement and that he meets "all if [sic] several of the five grounds for excusing a failure to exhaust."  Commission Response at 5.  The Racing Commission could in theory provide an adequate remedy, he allows, but the Racing Commissioners "have explicitly declined to do so." Commission Response at 5.  He contends that, because "the harms have and deprivations been fully completed," further Racing Commission proceedings would be futile.  Commission Response at 5-6.  He applies the same arguments to the Racing Commission Defendants' ripeness contentions.  See Commission Response at 7.

Gerhardt also questions the Racing Commission Defendants' reliance on Younger abstention.  See Commission Response at 6-7.  He states that the record in the matter is complete and that the Racing Commission's remand "is nothing more than a sham to obstruct Plaintiff's claims from going to judicial review."  Commission Response at 6.  He emphasizes that Younger abstention does not require federal deference to a state judicial proceeding reviewing legislative or executive action.  See Commission Response at 6-7.  Gerhardt concedes that dismissal is

---

[7]The Plaintiffs later argued that the order remanded the matter to the Executive Director instead of to the hearing officer.  See Tr. at 69:20-22 (Richards).  The Commission's decision does not specify whether it remands the matter back to the Executive Director or the hearing officer.  See Decision and Order at 1, filed October 28, 2015 (Doc. 31-1).

appropriate against the Racing Commission unless his prima facie tort claim survives the Commission Motion.  See Commission Response at 8.  He does not extend the same concession to individual Defendants.  See Commission Response at 8-9.

Gerhardt contends that quasi-judicial immunity does not apply to any of the Defendants. See Commission Response at 9-20.  He distinguishes Simon v. Taylor on several grounds.  See Commission Response at 9-10.  He notes that the Court expressly limited its holding: "The Racing Commissioners' functions are, *at least as relevant in this case*, similar to those of judges in the judicial process, the Racing Commissioners' decisions were likely to cause litigation, and the regulatory scheme *contained sufficient safeguards* to prevent unconstitutional conduct." Commission Response at 10 (quoting Simon v. Taylor, 981 F. Supp. 2d at 1062 (emphasis in Commission Response)).  He then distinguishes his situation, noting that "any confidence in decisions -- or lack of decisions -- reached by the Commission is utterly lacking."  Commission Response at 11.  He adds that the Court's factual findings in Simon v. Taylor assume that the Racing Commission will consider a proposal for decision "in open meeting" and will not take a decision under advisement.  Commission Response at 12 (quoting Simon v. Taylor, 981 F. Supp. 2d at 1049).  All of these allegations, Gerhardt says, show that the "sufficient safeguards" that Simon v. Taylor requires are illusory in this case.  Commission Response at 13-14.  He applies the same legal tests to Keiter and Mares, concluding that they were acting in a regulatory capacity rather than a judicial capacity.  See Commission Response at 14-16.  Finally, Gerhardt concludes that his prima facie tort claim survives, because the Defendants were not acting within their duties' scope under the NMTCA.  See Commission Response at 19-20.

The Racing Commission Defendants replied on December 4, 2015.  See Racing Commission Defendants' Reply in Support of Motion to Dismiss, filed December 4, 2015 (Doc.

39)("Commission Reply").   The Racing Commission Defendants assert that a continued administrative appeal "*could* result in a different determination on Plaintiff's challenges." Commission Reply at 4 (emphasis in original).  They state that the "Plaintiff only speculates, without citing basis [sic], that nothing more will or even can come of the remaining remand and review process."  Commission Reply at 4.  They also point out what they say are weaknesses in the Commission Response:

> Third, while quickly listing and claiming to meet the five criteria purportedly allowing administrative remedies to be bypassed, Plaintiff does not actually articulate why any, let alone all, of these criteria are met. . . .  Plaintiff purports to analyze, apply, and satisfy the first three criteria in a single, run-on sentence that is almost unintelligible.

Commission Reply at 5.  They add that the final factor, irreparable harm absent immediate judicial review, is inconsistent with Gerhardt's assertion that "(i) the harm done to Plaintiffs has already been completed fully; and (ii) the harm is not irreparable as it may be remedied by monetary []compensation."  Commission Reply at 6 (quoting Commission Response at 5).

The  Racing  Commission  Defendants  also  reinforce  their  arguments  for  Younger abstention.  See Commission Reply at 6-7.  They cite to Amanatullah v. Colo. Board of Medical Examiners, 187 F.3d 1160 (10th Cir. 1999), where the United States Court of Appeals for the Tenth Circuit affirmed the United States District Court for the District of Colorado's decision to abstain from interfering with state proceedings to revoke a physician's license to practice medicine.  See 187 F.3d at 1164.  They argue that, as in Amanatullah v. Colorado Board of Medical Examiners, there are ongoing administrative proceedings, the state provides an adequate forum to hear constitutional claims, and the relevant issue involves important state interests.  See Commission Reply at 7.

3.      **The Hearing.**

The Court held a hearing on December 18, 2015.  <u>See</u> Transcript of Hearing (taken December 18, 2015)("Tr.").[8]  The parties largely stuck to the arguments in their briefing.  The Court began discussion of the Woods Motion by confirming that Gerhardt's claim was "a conspiracy claim for violation of federal constitutional rights under 1983 and it's limited to that" and that "there is no state claim[ -- ]we don't have to worry about New Mexico Tort Claims Act with[] him and he's not being sued in any sort of official capacity."  Tr. at 5:10-23 (Court, Richards).  Gerhardt agreed to both points.  <u>See</u> Tr. at 5:10-23 (Court, Richards).  The Court granted the Surreply Motion, and noted that it reviewed the Surreply and is familiar with its arguments.  <u>See</u> Tr. at 6:11-19 (Court); <u>id.</u> at 7:15-19 (Court).

Woods explained that he was serving as an attorney at the time of the disputed settlement conference.  <u>See</u> Tr. at 14:5-17 (Biernoff).  He noted that, "if in several centuries of American jurisprudence there had been a case that allowed plaintiffs to maintain a suit against the adversary's attorney, as this plaintiff is trying to do here that the plaintiff would have directed the Court's attention to it."  Tr. at 16:16-21 (Biernoff).  If there is such a case, he added, it did not involve mere participation in a settlement conference.  <u>See</u> Tr. at 18:1-24 (Biernoff).  Gerhardt repeated the argument in his briefing that the Court should not focus only on the settlement conference and should hold Woods responsible "for the entire breadth of the conspiracy."  Tr. at 19:18-20:4 (Richards).  After questioning from the Court, Gerhardt argued that the conspiracy was aimed at depriving him of his right to engage in his chosen profession -- horse raising.  <u>See</u>

---

[8]The Court's citations to the transcript for this hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

Tr. at 21:17-22:8 (Court, Richards). At various points, he identified the First, Fourth, Fifth, and Fourteenth Amendments as the source of that right. See Tr. at 22:9-25:3 (Court, Richards).

Woods responded by emphasizing that Gerhardt entered the settlement conference voluntarily. See Tr. at 28:20-29:11 (Biernoff). He also objected to Gerhardt's attempt to "amend [his] pleading orally on the spot at the motion to dismiss hearing" to add First Amendment claims. Tr. at 29:21-30:2 (Biernoff). The Court stated that it was "inclined to grant [the] Woods motion to dismiss the amended complaint," noting that "the allegations here are just as consistent with an attorney doing their job as they are with somebody violating somebody's constitutional rights." Tr. at 33:6-17 (Court).

The parties then moved on to qualified immunity. See Tr. at 18-19 (Court). Woods assumed, for the sake of argument, that he had used the settlement conference to learn as much as possible about Gerhardt's case and use it to the Racing Commission's advantage. See Tr. at 34:25-35:5 (Biernoff). Even then, he said, the act would not violate any clearly established constitutional right. See Tr. at 35:5-7 (Biernoff). Gerhardt identified the relevant right as the "right to be protected from arbitrary actions of Government officials."[9] Tr. at 37:21-25 (Richards). He reiterated the need for additional discovery to uncover communications between Woods and other Racing Commission actors. See Tr. at 40:1-41:16 (Richards). The Court stated that it was inclined to agree that there had not been a constitutional violation and that it could not locate a sufficiently similar case to make any such right clearly established. See Tr. at 45:2-46:10. Given its agreement with Woods on both grounds, it noted that it was inclined to grant the Woods Motion. See Tr. at 46:11-17 (Court, Biernoff).

_____

[9]Later during the hearing, Gerhardt defined the relevant right as "the right of a horse owner to engage in the chosen profession of racing." Tr. at 73:17-19 (Richards).

The hearing shifted to the dispute between Gerhardt and the Racing Commission Defendants. See Tr. at 46:17-20 (Court). The Racing Commission Defendants first expanded on their ripeness argument. See Tr. at 47:13-18 (Court, Howell). They asserted that "the commission itself has not had an opportunity or has not yet made a decision" on Gerhardt's arguments. Tr. at 48:13-15 (Howell). In response to pointed questioning from the Court, the Racing Commission Defendants conceded that their delay in deciding the issue could drag on long enough to effectively constitute a denial, see Tr. at 48:25-51:6 (Court, Howell), but they presented excuses for the delay and questioned whether it caused Gerhardt any actual harm, see Tr. at 50:16-51:17 (Howell). They also stated that they were waiting for another hearing on the matter. See Tr. at 51:24-52:7 (Howell).

Gerhardt objected to their description of the situation, noting that the remand decision said nothing about a new hearing and gave no specific directions. See Tr. at 54:16-55:2 (Richards). He clarified that he challenged the Breed Certificate Rule's sudden and inconsistent application rather than its proper interpretation. See Tr. at 56:13-57:14 (Richards). He also argued that the Racing Commission could not provide adequate compensation, because his horse might be ineligible for future races: "The horses have very short racing careers, and when a horse does not get to race in one particular type of race it impacts their ability to race in future races." Tr. at 58:12-15 (Richards).

Regarding the Racing Commission Defendants, the Court observed that "it certainly looks like they're kind of dragging their feet here on this thing." Tr. at 61:22-23 (Court). The Court noted that the Racing Commission Defendants' action "puts the Court in a difficult position when the commission is basically saying don't do anything Federal Court, but I don't see the commission doing anything either. They're wanting me to defer either through a ripeness

doctrine or something else, but I don't see them doing anything either."  Tr. at 63:2-8 (Court). The Racing Commission Defendants argued that they were still within an appropriate time frame, "[b]ecause of the uniqueness of the issue and the recent action on it."  Tr. at 63:17-21 (Howell).

The parties moved on to discuss the remaining issues after a break.  See Tr. at 65:20-22 (Court).  The parties repeatedly clashed over whether their dispute was centered on the Racing Commission's proper interpretation of the Breed Certification Rule, with the Racing Commission Defendants repeatedly questioning why the Rule was irrelevant.  See Tr. at 74:14-22 (Howell)("[W]hat's being challenged is a disqualification of a horse from a race, where the basis of the disqualification was an interpretation of that rule.  It's nonsensical to keep arguing that it's irrelevant."); Tr. at 77:5-79:2 (Richards)("[R]ight or wrong we don't care, they applied it in a way that violated equal protection, applied it in a way that deprived folks of meaningful due process[.]").

The Court then shifted the discussion to focus on judicial immunity.  See Tr. at 80:10-11 (Court).  It established, through questioning of both parties, that Gerhardt was no longer suing the Racing Commission as an entity, and that his remaining claims were only against individuals. See Tr. at 80:16-81:10 (Court, Howell, Richards).[10]  The Racing Commission Defendants argued

---

[10]Gerhardt stated during the hearing that his inclusion of the Commission in the caption was an oversight:

> THE COURT:  The Eleventh is only going to cover the commission, right?
>
> MR. HOWELL:  Understood.
>
> THE COURT:  You concede that, right?
>
> MS. RICHARDS:  Your Honor, we did in our response.  So to the extent the commission was still left in the caption --

that this fact does not alter the "quasijudicial immunity analysis," because Gerhardt brought suit against the individuals in their official capacities.  Tr. at 82:5-8 (Howell).  Gerhardt again argued that there were insufficient constitutional safeguards to allow any form of judicial immunity. See Tr. at 86:7-12 (Richards).  The Court pointed out, however, that the Supreme Court of New Mexico could potentially resolve all of the Plaintiffs' claims, and that this ability to appeal makes the Racing Commission's decision seem like a real judicial function.  See Tr. at 87:12-22 (Court, Richards).  The Plaintiffs responded that the Racing Commission should not be able to rule on whether its sudden decision to interpret its regulations differently was legal.  See Tr. at 97:6-17 (Richards).  The Court ultimately remarked that "it's going to be a hard sell to say that judicial immunity goes down to the level of the executive director and the steward."  Tr. at 101:21-24 (Court).  The Court confirmed with the Racing Commission Defendants, however, that it could cease its consideration of Gerhardt's federal claims if it found judicial immunity.  See Tr. at 106:1-4 (Court, Howell).

--------

THE COURT:  Are you suing the commissioners in their official capacity?

MS. RICHARDS:  No, sir.

THE COURT:  Okay.  Just individually?

MS. RICHARDS:  Right.  And I will clarify, in the complaint the commission itself is not listed in any cause of action, nothing covers them.  The New Mexico Racing Commission was just still left in the caption as these folks worked for them.

THE COURT:  Are you suing the commission?

MS. RICHARDS:  No, sir.

Tr. at 80:16-81:8 (Court, Richards).

Gerhardt then attempted to circumvent the state's Eleventh Amendment immunity for his prima facie tort claim by arguing that the individual Defendants acted outside the scope of their authority.   See Tr. at 107:9-25 (Court, Richards).   The Racing Commission Defendants responded that Gerhardt made no similar argument in his complaint.   See Tr. at 109:20-110:4 (Howell).

The Court then summed up its opinions.   See Tr. at 110:9-113:5 (Court).   It noted that it was unsure on its power and obligation to act and the ripeness issue.   See Tr. at 110:9-15 (Court). It stated that the Racing Commissioners would probably qualify for judicial immunity, but that Keiter and Mares would not.   See Tr. at 110:25-111:2 (Court).   The state claim, the Court noted, would likely fail, because the Defendants did not act outside the scope of their authority.   See Tr. at 111:5-10 (Court).   Finally, it noted that it would likely grant the Woods Motion.   See Tr. at 111:11-15 (Court).

## LAW REGARDING RULE 12(b)(1)

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress."   Henry v. Office of Thrift Supervision, 43 F.3d 507, 511 (10th Cir. 1994)(citations omitted).   A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims.   See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its existence.").   Rule 12(b)(1) allows a party to raise the defense of the court's "lack of jurisdiction over the subject matter" by motion.   Fed. R. Civ. P. 12(b)(1).   The Tenth Circuit has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or

(2) a challenge to the actual facts upon which subject matter jurisdiction is based." Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002).

> On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true. See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981). But when the attack is aimed at the jurisdictional facts themselves, a district court may not presume the truthfulness of those allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 [summary-judgment] motion.

Hill v. Vanderbilt Capital Advisors, LLC, No. CIV 10-0133, 2011 WL 6013025, at *8 (D.N.M. Sept. 30, 2011)(Browning, J.). The United States Court of Appeals for the Fifth Circuit has stated:

> [T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very power to hear the case -- there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the allegations in the complaint to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or other evidence properly before the court. See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995). In those instances, a court's reference to evidence outside the pleadings does not necessarily convert the motion to a rule 56 motion for summary judgment. See Holt v. United States, 46 F.3d at 1003 (citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)).

Where, however, the court determines that jurisdictional issues raised in a rule 12(b)(1) motion are intertwined with the case's merits, the court should resolve the motion under either rule 12(b)(6) or rule 56. See Franklin Sav. Corp. v. United States, 180 F.3d 1124, 1129 (10th Cir. 1999); Tippet v. United States, 108 F.3d 1194, 1196 (10th Cir. 1997). "When deciding whether jurisdiction is intertwined with the merits of a particular dispute, 'the underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim.'" Davis ex rel. Davis v. United States, 343 F.3d 1282, 1296 (10th Cir. 2003)(quoting Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324 (10th Cir. 2002)).

## LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.). The complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010)(Seymour, J.).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d at 1177 (emphasis omitted).  The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(citations omitted).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009) and Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").

## LAW REGARDING RIPENESS

"In order for a claim to be justiciable under Article III, it must be shown to be a ripe controversy."  New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1499.  Ripeness pertains to the timing of a case and is intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1499 (citation omitted)(internal quotation marks omitted).  Ripeness is a component of the Article III requirement that limits judicial review to "cases or controversies."  U.S. Const. art. III, § 2.  See U.S. West, Inc. v. Tristani, 182 F.3d 1202, 1208 (10th Cir. 1999).  A controversy must be "definite and concrete, touching the legal relations of parties having adverse legal interests," and "a real and substantial controversy admitting of specific relief through a decree of a conclusive character."  Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41 (1937).  "[T]he question in each case is whether the facts alleged, under all circumstances, show that there is a substantial controversy, between parties

having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007)(citation omitted).

In MedImmune, Inc. v. Genentech, Inc., a patent licensee, who continued to pay royalties for use of the patent, brought a declaratory-judgment action against the patent holder to determine whether the patent was invalid or unenforceable. See 549 U.S. at 121-25. What appeared to be missing in the case was the requisite immediacy -- there was little likelihood that the patent holder would ever bring suit against the licensee, because the licensee was continuing to pay royalties. Nevertheless, the Supreme Court held that there was an actual case or controversy, because the looming threat of the licensee having to pay treble damages, if it halted payments and the patent was ultimately upheld, "coerced" the licensee's payment of royalties. MedImmune, Inc. v. Genentech, Inc., 549 U.S. at 129. Avoidance of such dilemmas "was the very purpose of the Declaratory Judgment Act." MedImmune, Inc. v. Genentech, Inc., 549 U.S. at 129. Two cases concerning foreign policy illustrate the need for the facts to mature before declaratory-judgment jurisdiction arises. In Rabinowitz v. Kennedy, 376 U.S. 605 (1964), the Supreme Court held that the petitioner attorneys were not exempt from registration under the Foreign Agents Registration Act, but it refused to consider whether the questions asked on the registration forms were proper. See 376 U.S. at 610. Noting that the forms advised registrants that government regulations allowed them to apply for waivers of inappropriate or unduly burdensome requirements, it said: "Since petitioners have made no attempt to determine which questions must be answered and how much information disclosed, this issue is not ripe for adjudication." Rabinowitz v. Kennedy, 376 U.S. at 610. In Zemel v. Rusk, 381 U.S. 1 (1965), the Supreme Court refused to consider Zemel's claim that he was constitutionally entitled to

travel to Cuba.  See 381 U.S. at 3.  The Supreme Court explained that it would need to know the

specifics of the travel:

> The complaint filed in this case does not specify the sort of travel to Cuba
> appellant has in mind -- e.g., whether he plans to proceed to Cuba directly or
> travel there via one or more other countries. Nor can we tell from the papers filed
> whether the Government will, in the event appellant journeys to Cuba, charge him
> under § 215(b) with leaving the United States on a carrier bound for Cuba with a
> passport not validated for Cuba; leaving the United States with such a passport
> with the intent of traveling to Cuba before he returns home; leaving the United
> States with such a passport on a journey which in fact takes him to Cuba;
> re-entering the United States with such a passport after having visited Cuba; some
> other act -- or whether it will charge him at all.  Whether each or any of these
> gradations of fact or charge would make a difference as to criminal liability is an
> issue on which the District Court wisely took no position.  Nor do we.  For if we
> are to avoid rendering a series of advisory opinions, adjudication of the reach and
> constitutionality of § 215(b) must await a concrete fact situation.

Zemel v. Rusk, 381 U.S. at 19-20.

In Eccles v. Peoples Bank, 333 U.S. 426 (1948), the Supreme Court held that a

declaratory-judgment action was not ripe.  See 333 U.S. at 427.  The bank sought to challenge a

condition imposed on its membership in the Federal Reserve System that restricted Transamerica

Corporation's ownership of its stock.   See Eccles v. Peoples Bank, 333 U.S. at 428-29.

Transamerica Corporation had acquired a few shares of stock, but only for investment, and not to

obtain any control over the bank, which was what the membership condition was meant to

prevent.  See Eccles v. Peoples Bank, 333 U.S. at 430-31.  The bank filed suit, because it feared

that, if it lost its membership, its deposits would not be insured.  See Eccles v. Peoples Bank,

33 U.S. at 427.  When suit was brought, however, the bank had failed to show "[t]he actuality of

the plaintiff's need for a declaration of his rights."  Eccles v. Peoples Bank, 33 U.S. at 432.  The

Federal Reserve Board had "disavow[ed] any action to terminate the Bank's membership" under

the existing circumstances.   Eccles v. Peoples Bank, 33 U.S. at 432.  The Supreme Court

described the suit:

> [T]he Bank seeks a declaration of its rights if it should lose its independence
> [from Transamerica], or if the Board of Governors should reverse its policy and
> seek to invoke the condition even though the Bank remains independent and if
> then the Directors of the Federal Deposit Insurance Corporation should not
> change their policy not to grant deposit insurance to the Bank as a non-member of
> the Federal Reserve System.

Eccles v. Peoples Bank, 33 U.S. at 432.  In the Supreme Court's view, "[t]he concurrence of these contingent events, necessary for injury to be realized, is too speculative to warrant anticipatory judicial determinations."  Eccles v. Peoples Bank, 33 U.S. at 432.  It concluded: "[The] Bank's grievance here is too remote and insubstantial, too speculative in nature, to justify an injunction against the Board of Governors, and therefore equally inappropriate for a declaration of rights." Eccles v. Peoples Bank, 33 U.S. at 434.  Addressing these Supreme Court cases, the Tenth Circuit has held: "The Court made clear that generally one cannot bring a declaratory judgment action just to resolve one isolated issue in a possible future controversy." Columbian Fin. Corp. v. BancInsure, Inc., 650 F.3d 1372, 1380 (10th Cir. 2011).

In Plant Oil Powered Diesel Fuel Systems, Inc. v. ExxonMobil Corp., 801 F. Supp. 2d 1163 (D.N.M. 2011)(Browning, J.), the Court held that certain claims that a proposed fit-for-purpose guideline violated antitrust principles was not ripe, because the plaintiff had not shown a hardship, and because the claims were based on "uncertain or contingent future events."  801 F. Supp. 2d at 1184.  The Court found that, "[b]ecause the Fit-for-Purpose Guidelines are both in their early stages and because their development is on-going, creating uncertainty what form they will ultimately take if and when they are submitted for approval, the Court concludes that POP Diesel's claims based on the Fit-for-Purpose Guidelines are premature."  Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp, 801 F. Supp. 2d at 1185.  In Carroll v. Los Alamos National Security, LLC, 704 F. Supp. 2d 1200 (D.N.M. 2010)(Browning, J.), the Court found that negligent misrepresentation claims were ripe for adjudication.  See 704 F. Supp. 2d at 1219.

There, the defendant conceded that an employee gave the plaintiff incorrect information when the plaintiff was deciding on a pension plan.  See Carroll v. Los Alamos Nat'l Sec., LLC, 704 F. Supp. 2d at 1219.  The Court found that the plaintiff had a legally protected interest in being given correct information regarding his pension-plan options and in making a fully informed selection.  See  Carroll v. Los Alamos Nat'l Sec., LLC, 704 F. Supp. 2d at 1220.  The Court held that, because the plaintiff had a legally protected interest in receiving accurate information and there was no dispute that he did not, he was injured, and the matter was ripe for adjudication.  See  Carroll v. Los Alamos Nat'l Sec., LLC, 704 F. Supp. 2d at 1220.  With respect to the accrual of the cause of action, the Court found that the claim had accrued, because the plaintiff had suffered an injury, which gave rise to a claim, even though he had not yet suffered damages.  See Carroll v. Los Alamos Nat'l Sec., LLC, 704 F. Supp. 2d at 1221.  Ultimately, however, the Court granted the defendants' motion for summary judgment on the negligent misrepresentation claims, because the plaintiff had not established that the defendants caused him harm or that the defendants' conduct would harm him in the future.  See Carroll v. Los Alamos Nat'l Sec., LLC, 704 F. Supp. 2d at 1226.

## LAW REGARDING JUDICIAL IMMUNITY

"[J]udges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly."  Stump v. Sparkman, 435 U.S. 349, 355-56 (1978).  That same immunity continues even if the judge's "exercise of authority is flawed by the commission of grave procedural errors."  Stump v. Sparkman, 435 U.S. at 359.

The Supreme Court has emphasized that a judge's immunity from § 1983 liability "is overcome in only two sets of circumstances.  First, a judge is not immune from liability for

nonjudicial acts, i.e., actions not taken in the judge's judicial capacity.  Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." Mireles v. Waco, 502 U.S. 9, 11-12 (1991)(citations omitted).  The Supreme Court has also held that absolute judicial immunity was not affected or abolished "by § 1983, which makes liable 'every person' who under color of law deprives another person of his civil rights."  Pierson v. Ray, 386 U.S. 547, 554 (1967), overruled in part on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982).

The Tenth Circuit has also recognized that "officials in administrative hearings can claim the absolute immunity that flows to judicial officers if they are acting in a quasi-judicial fashion."  Guttman v. Khalsa, 446 F.3d at 1033 (citing Butz v. Economou, 438 U.S. at 514).  For an official at an administrative hearing to enjoy absolute immunity, "(a) the officials' functions must be similar to those involved in the judicial process, (b) the officials' actions must be likely to result in damages lawsuits by disappointed parties, and (c) there must exist sufficient safeguards in the regulatory framework to control unconstitutional conduct."  Guttman v. Khalsa, 446 F.3d at 1033 (quoting Horwitz v. State Bd. of Med. Examr's, 822 F.2d 1508, 1513 (10th Cir. 1987)("Horwitz")(internal quotation marks omitted)).

In Guttman v. Khalsa, a doctor who suffered from depression and post-traumatic stress disorder appeared before the Impaired Physicians Committee of the New Mexico Board of Medical Examiners to respond to complaints about his professional conduct.  See 446 F.3d at 1030.  The Committee in Guttman v. Khalsa issued a "Notice of Contemplated Action and an Order of Summary Suspension" of the doctor's medical license based on alleged mental illness and lying to the Committee.  446 F.3d at 1030.  The New Mexico Board of Medical Examiners then held a hearing, during which one of the defendants acted as Administrative Prosecutor.  See

446 F.3d at 1030.  The New Mexico Board of Medical Examiners in Guttman v. Khalsa revoked the doctor's medical license pursuant to its statutory authority to do so.  See 446 F.3d at 1030.

The doctor in Guttman v. Khalsa appealed the decision to the Seventh Judicial District of New Mexico.  See 446 F.3d at 1030.  The Seventh Judicial District of New Mexico denied the appeal, and the doctor then appealed to the Court of Appeals of New Mexico.  See 446 F.3d at 1030.  After the Court of Appeals of New Mexico affirmed, the doctor filed a petition for certiorari with the Supreme Court of New Mexico.  See 446 F.3d at 1030.  Before the Supreme Court of New Mexico could act on the petition, the doctor filed a lawsuit in federal court, alleging, among other things, violations of his constitutional rights.  See 446 F.3d at 1030.

The Tenth Circuit found that the Administrative Prosecutor and the individual who presided over the three-day hearing in front of the New Mexico Board of Medical Examiners enjoyed absolute immunity.  See Guttman v. Khalsa, 446 F.3d at 1032.  The basis for the hearing officer's immunity in Guttman v. Khalsa was that he had served a quasi-judicial function.  See 446 F.3d at 1032.

The Tenth Circuit in Guttman v. Khalsa also relied on Horwitz.  See 822 F.2d at 1508.  In Horwitz, the Tenth Circuit concluded that members of the State Board of Medical Examiners for the State of Colorado enjoyed absolute immunity for actions it took in filing a formal complaint against a doctor, and in temporarily suspending his right to practice medicine pending investigations and hearings.  See 822 F.2d at 1510, 1515.  The Tenth Circuit reasoned that the defendant Board members were performing adjudicatory and prosecutorial functions.  See 822 F.2d at 1515.  The Tenth Circuit also noted:

> There exists a strong need to insure that individual Board members perform their functions for the public good without harassment or intimidation. There exist adequate due process safeguards under Colorado law to protect against unconstitutional conduct without reliance upon private damages lawsuits.

> It is important to insulate Board members from political influences in meeting their adjudicatory responsibilities in the adversarial setting involving licensure to practice medicine.  Public policy requires that officials serving in such capacities be exempt from personal liability.

822 F.2d at 1515.   Finally, the Tenth Circuit pointed out the Board members' functions, observing that Board members

> serve in the prosecutorial role in that they, among other things, initiate complaints, start hearings, make investigations, take evidence, and issue subpoenas.  They also serve in the adjudicative role, as judges.  Thus, the Board duties are "functionally comparable" to a court of law.  And we are reminded that, with respect to immunity, we must include all acts of the official performing statutory duties as having "[m]ore or less connection with the general matters committed by law" to his station.

822 F.2d at 1515.

Although certain officers enjoy immunity from suit for acts taken in a quasi-judicial setting, the Supreme Court has held that court reporters do not enjoy such immunity.  Rejecting a court reporter's claim of absolute immunity, the Supreme Court stated: "We are also unpersuaded by the contention that our functional approach to immunity . . . requires that absolute immunity be extended to court reporters because they are part of the judicial function." Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 435 (1993).  Rather, in the Supreme Court's view,

> [t]he doctrine of judicial immunity is supported by a long-settled understanding that the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability.  Accordingly, the "touchstone" for the doctrine's applicability has been "performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights."   [Burns v. Reed,] 500 U.S. [478,] 500 [(1991)](Scalia, J., concurring in judgment in part and dissenting in part).  When judicial immunity is extended to officials other than judges, it is because their judgments are "functional[ly] comparab[le]" to those of judges -- that is, because they, too, "exercise a discretionary judgment" as a part of their function.   Imbler v. Pachtman, 424 U.S. [409] at 423, n. 20 [(1976)].

Antoine v. Byers & Anderson, Inc., 508 U.S. at 435-36 (footnote omitted)(final two alterations in

original).

In light of this understanding of judicial immunity, the Supreme Court found that the function that court reporters perform is not one that would lead to a grant of immunity.  See 508 U.S. at 436.  The Supreme Court reasoned that court reporters "are afforded no discretion" in carrying out their duty and that they are "not absolutely immune because their duties are ministerial, not discretionary in nature."  508 U.S. at 436 (citations omitted)(internal quotation marks omitted).

The Court has also drawn distinctions between when a person is acting in a judicial role, such that they are entitled to quasi-judicial immunity,[11] and when a person in a quasi-judicial setting plays a merely ministerial role.  See Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d 1180, 1204 (D.N.M. 2009)(Browning, J.).  In Duprey v. Twelfth Judicial District Court, the Court found that the state defendant who acted as chairperson of the judicial grievance board was entitled to absolute immunity, because his function was similar to that of an administrative law judge in a quasi-judicial setting.  See 760 F. Supp. 2d at 1204.  The Court found that the director of human resources for the New Mexico Administrative Office of the Courts was not entitled to absolute immunity, because her role was ministerial and mechanical.  See 760 F. Supp. 2d at 1204.  In analyzing each defendant's function, the Court focused on participation in the deliberative process and the exercise of independent judgment.  See 760 F. Supp. 2d at 1205. The Court determined that, because the human resources director played a ministerial role and did not act at the direction of a judge, she was not entitled to judicial immunity.  See 760 F. Supp. 2d at 1208 ("An individual whose job at a judicial proceeding is to run a tape recorder is

---

[11] Quasi-judicial immunity affords "non-judicial officers the same absolute immunity enjoyed by judges when a claim is based on duties performed in furtherance of the judicial process."  Henshaw v. Bliss, 421 F.App'x 870, 871 (10th Cir. 2011).

not one who needs to be able to act according to her own convictions."). See also Braverman v. New Mexico, No. 11-0829, 2011 WL 6013587, at *20 (D.N.M. Oct. 19, 2011)(Browning, J.)(finding that judicial immunity probably protects a state judge and special master from suit when denying a motion for a temporary restraining order).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978). "The qualified immunity analysis is the same whether the claims are brought under Bivens[12] or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials

---

[12]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment to the Constitution of the United States "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct." 403 U.S. at 389.

may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982).  That means a court can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.  The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 563 U.S. 692, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."

Pearson v. Callahan, 555 U.S. at 232 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)).  "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit."  Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken beliefs" and operates to protect officers from the law's sometimes "hazy border[s]."  Saucier v. Katz, 533 U.S. at 205.  When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

### 1.      Procedural Approach to Qualified Immunity.

In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."

555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol

outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the

Constitution, and then the court determines if the right violated was clearly established -- will

often be beneficial.  See Pearson v. Callahan, 555 U.S. at 241.  In rejecting the prior mandatory

approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a

constitutional right is not clearly established but far from obvious whether in fact there is such a

right," and that such an approach burdens district court and courts of appeals with "what may

seem to be an essentially academic exercise."   555 U.S. at 237.  The Supreme Court also

recognized that the prior mandatory approach "departs from the general rule of constitutional

avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of

constitutionality unless such adjudication is unavoidable."   555 U.S. at 241 (alterations

omitted)(internal quotation marks omitted).  See Reichle v. Howards, 132 S. Ct. 2088, 2093

(2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity

issues on the basis of a right being not "clearly established" by prior case law "comports with our

usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes

an inference that the defendant's conduct violated a clearly established constitutional right, a

qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d

867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed

directly to and "should address only" the clearly established prong of the qualified immunity

analysis: when (i) the first, constitutional violation question "is so factbound that the decision

provides little guidance for future cases"; (ii) "it appears that the question will soon be decided

by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation

of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual

basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a

risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks

"bad decisionmaking," because the court is firmly convinced that the law is not clearly

established and is thus inclined to give little thought to the existence of the constitutional right;

or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first

constitutional question when "it is plain that a constitutional right is not clearly established but

far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81

(10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42)(internal quotation marks

omitted).[13] Regarding the last of these seven circumstances, the Supreme Court has clarified that

---

[13]As former-Tenth Circuit judge, and now Stanford Law School professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions. See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014). This practice is good for the nation's judicial system to achieve uniformity in a nation of 319 million people. See, e.g., Michigan v. Long, 463 U.S. 1032, 1040 (1983)(stating that "there is an important need for uniformity in federal law"). But see Amanda Frost, Overvaluing Uniformity, 94 Va. L. Rev. 1567 (2008)(criticizing courts' focus on uniformity of the law). If a district court in New Mexico is trying -- as it does diligently and faithfully -- to receive and read the unwritten signals of its superior courts, it would appear that Justice Alito in Pearson v. Callahan and Judge Gorsuch in Kerns v. Bader are trying to suggest that district courts should, whenever possible, decide qualified immunity on the clearly established prong. For example, Justice Alito and Judge Gorsuch gave seven situations when the Court should decide a case solely on the clearly established element and not "avoid avoidance." Kerns v. Bader, 663 F.3d at 1180-81. Even the phrase "avoid avoidance" suggests that the district court is to generally avoid, not decide, the constitutional issue.

The Court is concerned about this push to not decide constitutional issues, for a number of reasons. The Court set forth some of these concerns in Kerns v. Board of Commissioners. Additionally, there is a practical problem. Sometimes, for a district court to really know whether a right is clearly established, it has to do the first analysis, and thoroughly explore whether there is a right and whether it has been violated. If it jumps to the mushy, hazy area of clearly established without knowing what the right is, the analysis lacks any precision. While appellate courts may think that jumping to the clearly established prong saves district courts a lot of

courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely only to face challenges in the qualified immunity context.  Camreta v. Greene, 131 S. Ct. 2020, 2031-2 (2011).  See Kerns v. Bader, 663 F.3d at 1181.[14]  "Courts should think carefully before expending 'scarce judicial resources' to resolve

_____

trouble, in the Court's experience, the old rule -- in Saucier v. Katz -- made more sense and, practically, is the way the Court still has to go in many cases.

[14]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:

>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . .  The predecessor of § 1983 was thus an important part of the basic alteration in our

federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39 (modifications in original).  Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test.  See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy.  Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged

difficult and novel questions of constitutional or statutory interpretation that will 'have no effect

on the outcome of the case.'"  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson

v. Callahan, 555 U.S. at 236-37).  See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts

should think hard, and then think hard again, before turning small cases into large ones." [15]).  The

---

the courts to drop the suppression remedy and the legislature to provide more --
not less -- civil remedies for constitutional violations.  See Christopher Slobogin,
Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363,
390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very
effective in scaring police into behaving. . . .  These theories also suggest that a
judicially administered damages regime . . . would fare significantly better at
changing behavior at an officer level.");  Hon. Malcolm R. Wilkey, Constitutional
Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing
the exclusionary rule and recommending alternatives).  In Hudson v. Michigan,
547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable
alternative to a motion to suppress when it held that the exclusionary rule was
inapplicable to cases in which police officers violate the Fourth Amendment when
they fail to knock and announce their presence before entering.  See 547 U.S.
at 596-97.   Rather than being a poor or discouraged means of developing
constitutional law, § 1983 seems the better and preferable alternative to a motion
to suppress.  It is interesting that the current Supreme Court and Tenth Circuit
appear more willing to suppress evidence and let criminal defendants go free, than
have police pay damages for violations of innocent citizens' civil rights.  It is odd
that the Supreme Court has not adopted a clearly established prong for
suppression claims; it seems strange to punish society for police violating unclear
law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.),
abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL
936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).   See Fourth
Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that
municipalities should establish small-claims courts to adjudicate police officers' Fourth
Amendment violations).

[15]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena
Kagan's comments about "large" and "small" cases:

While the Court is, of course, obligated to follow faithfully the Supreme Court's
decisions and opinions, the Court has always been unenlightened and even
troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large"
and "small" cases.  131 S. Ct. at 2032.  As a trial judge, the Court has tried
assiduously to avoid thinking about or categorizing some cases as "large" and

some as "small." It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment. Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job. The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way. Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts. The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice. The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance. Thus, Justice Kagan's comments are not self-defining and disturbing.

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The three most recent qualified immunity cases the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012). In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation. See 132 S. Ct. at 2092, 2097. In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 S. Ct. at 1660, 1668. In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error. See 132 S. Ct. at 1241, 1250. The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant. See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then

Tenth Circuit will remand a case to the district court for further consideration when the district

court has given cursory treatment to the clearly established prong of the qualified immunity

analysis.  See Kerns v. Bader, 663 F.3d at 1182.

### 2.      Clearly Established Rights in the Qualified Immunity Analysis.

To determine whether a right was clearly established, a court must consider whether the

right was sufficiently clear that a reasonable government employee in the defendant's shoes

would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep.

Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally

defined as a right so thoroughly developed and consistently recognized under the law of the

jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429

F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162,

172-73 (D.C. Cir. 1983)).[16]

---

detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1222 n.35.

[16]Lobozzo v. Colo. Dep't of Corr. is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. at 640. "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d at 1298.

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards,

_____

with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court concludes that Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011) has persuasive value with respect to material issues and will assist the Court in its preparation of this Memorandum Opinion and Order.

132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083).  "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."  Anderson v. Creighton, 483 U.S. at 639.  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."  Ashcroft v. al-Kidd, 131 S. Ct. at 2084.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" on the application of law to facts and operates to protect officers from the law's sometimes "hazy border[s]."  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference."  663 F.3d at 1188 (emphasis in original).  In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  See Casey v. City of Fed. Heights, 509 F.3d at 1284 ("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").  "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  Casey v. City of Fed. Heights, 509

F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving

fair and clear warning . . . ."  Hope v. Pelzer, 536 U.S. at 741.

In Rivera v. Bates, No. CIV 12-0473 JB/RHS, 2014 WL 3421050 (D.N.M. June 21,

2014)(Browning, J.), the Court used the Kerns v. Bader qualified-immunity framework to

determine if it was clearly established that arresting a suspect in his underwear and failing to

retrieve his clothing to cover him while transporting him from his house to a patrol car makes the

arrest unreasonable.  See 2014 WL 3421050, at *54.  The Court stated:

> Even if the Court could, on the record before it, conclude, as a matter of law, that
> the manner in which Hernandez effectuated the arrest was [un]reasonable, the
> Court finds that the law was not clearly established such that a reasonable officer
> in Hernandez' position would have recognized that he needed to retrieve clothing
> for S. Rivera rather than escort him directly to the police vehicle.  As the Tenth
> Circuit has emphasized, although "a case on point isn't required if the impropriety
> of the defendant's conduct is clear from existing case law," the law is not clearly
> established where "a distinction *might* make a constitutional difference."  Kerns v.
> Bader, 663 F.3d at 1188 (emphasis in original).  In Kerns v. Bader, dealing with
> the search of a home, the Tenth Circuit explained that the relevant question
> "wasn't whether we all have some general privacy interest in our home," but
> "whether it was *beyond debate* in 2005 that the officers' entry and search lacked
> legal justification."  663 F.3d at 1183 (emphasis added).  Here, S. Rivera has
> relied on Cortez v. McCauley to establish that his clearly established rights were
> violated, but the Tenth Circuit in that case stated that it had "little difficulty
> concluding that a small amount of force, like grabbing Rick Cortez and placing
> him in the patrol car, is permissible in effecting an arrest under the Fourth
> Amendment."  663 F.3d at 1128.  The Tenth Circuit only made one comment
> regarding Cortez' clothing during the arrest:
>
>> Although the dignity aspects of this arrest are troubling,
>> specifically hauling Rick Cortez (clad only in his shorts) into the
>> patrol car in the middle of the night without any explanation, the
>> police were investigating a serious felony and claimed a need for
>> quick action to separate the accused from any other children that
>> might be in the home.
>
> 478 F.3d at 1128-29.  The Tenth Circuit did not explain what would have to be
> different about the "dignity aspects" for the arrest to violate the Fourth
> Amendment.  More importantly, the Court emphasizes that Hernandez did not
> participate in any of the alleged wrongdoing inside S. Rivera's house, nor did he
> refuse to allow S. Rivera to get dressed; instead, Hernandez was involved in the

arrest only after S. Rivera was outside the house.  S. Rivera has not pointed to, nor has the Court been able to identify, any cases that demand that an officer delay taking the arrestee to a police vehicle so the officer can enter the arrestee's home to search for clothing or otherwise find some covering for an arrestee on the way to the police vehicle.  The Court will thus grant the MSJ on S. Rivera's excessive and unreasonable force claim against Hernandez.

Rivera v. Bates, 2014 WL 3421050, at *54 (emphasis in original).

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)(McKay, J.)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th

Cir. 2006)(Henry, J.)).  The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.  See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casaus, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998)(Seymour, J.).

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d at 1046.  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory

damages for all injuries suffered as a consequence of those deprivations.  The recovery should be guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

The Tenth Circuit has found liability for defendants who proximately cause an injury alleged under § 1983, explaining that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."  Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995).  "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."  Id.  In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.  See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."  Martinez v. Carson, 697 F.3d at 1255.  The Tenth Circuit gave an example of a superseding intervening cause, quoting the Honorable Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the Third Circuit, now-Associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence.  Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest.  The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to

> shoot the third officer when that officer disarms the suspect and in the process injures him.  Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful?  The obvious answer is "no."  The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability.  See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400)(citations in original).  Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not supersede the defendant's responsibility."  Trask v. Franco, 446 F.3d at 1047 (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 44, at 303-04 (5th ed. 1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing RESTATEMENT (SECOND) OF TORTS § 453 cmt. b (1965)).

## LAW REGARDING EXERCISE OF DISCRETIONARY JURISDICTION OVER DECLARATORY JUDGMENT ACTIONS

The Federal Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  "[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites."  Wilton v. Seven Falls Co., 515 U.S. 277, 282 (1995).  In Brillhart v. Excess Insurance Co. of America, 316 U.S. 491 (1942), the Supreme Court of the United States

explained that district courts are "under no compulsion to exercise . . . jurisdiction" under the

Federal Declaratory Judgment Act.  316 U.S. at 494.   The Supreme Court explained:

> Ordinarily it would be uneconomical as well as vexatious for a federal court to
> proceed in a declaratory judgment suit where another suit is pending in a state
> court presenting the same issues, not governed by federal law, between the same
> parties.  Gratuitous interference with the orderly and comprehensive disposition
> of a state court litigation should be avoided.

316 U.S. at 495.  A court should determine whether the lawsuit "can be better settled in the

proceeding pending in the state court."  Brillhart v. Excess Ins. Co. of Am., 316 U.S. at 495.

The Tenth Circuit has adopted a five-factor test for evaluating whether a district court

should exercise its discretionary jurisdiction over a declaratory judgment action:

> [1] whether a declaratory action would settle the controversy; [2] whether it
> would serve a useful purpose in clarifying the legal relations at issue; [3] whether
> the declaratory remedy is being used merely for the purpose of "procedural
> fencing" or "to provide an arena for a race to res judicata"; [4] whether use of a
> declaratory action would increase friction between our federal and state courts
> and improperly encroach upon state jurisdiction; and [5] whether there is an
> alternative remedy which is better or more effective.

St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d 1167, 1169 (10th Cir. 1995)(quoting

Mhoon, 31 F.3d at 983).  In St. Paul Fire and Marine Insurance Co. v. Runyon, the plaintiff, an

insurance company, sought a declaratory judgment that it had no obligation to defend the

defendant under the terms of a professional-liability insurance policy.  See 53 F.3d at 1168.  The

defendant sought indemnification and defense for claims that his coworkers brought.  See 53

F.3d at 1168.  The insurance-company plaintiff refused to provide a defense.  See 53 F.3d at

1168.  After three years of negotiation, the defendant told the insurance-company plaintiff that he

would initiate a state court suit for breach of contract and bad faith by February 18, 1994 if it did

not assume his defense.  See 53 F.3d at 1168.  On February 17, 1994, the insurance-company

plaintiff filed a federal court diversity action for declaratory judgment.  See 53 F.3d at 1168.  The

defendant filed a complaint for bad faith and breach of contract in state court on February 18, 1994.  See 53 F.3d at 1168.

The Tenth Circuit noted that the federal declaratory-judgment statute, 28 U.S.C. § 2201, "vests the federal courts with power and competence to issue a declaration of rights."  St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d at 1168.  "[W]hether this power should be exercised in a particular case is vested in the sound discretion of the district courts."  53 F.3d at 1168.  The federal district court in St. Paul Fire and Marine Insurance Co. v. Runyon had abstained from exercising jurisdiction, "because the same issues were involved in the pending state proceeding, and therefore, there existed a more effective alternative remedy."  53 F.3d at 1169.

The Tenth Circuit explained in St. Paul Fire and Marine Insurance Co. v. Runyon:

The parties have a pending state contract action, which incorporates the identical issue involved in the declaratory judgment action.  [The defendant's] state breach of contract complaint against [the insurance-company plaintiff] alleges the coworkers' lawsuit is a "covered claim" pursuant to the insurance policy.  In resolving the insurance contract, the state court will necessarily determine rights and obligations under the contract.  [The insurance-company plaintiff] is seeking a declaration by the federal court that the coworkers' lawsuit is not a covered claim.  The issue in the federal declaratory judgment action is identical to what would be a defense to the state court contract action -- whether [the defendant]'s insurance contract with [the insurance-company plaintiff] protects him from the coworkers' lawsuit.  Because the state court will determine, under state contract law, whether the tort action is covered by the insurance contract, it is not necessary for the federal court to issue a declaration on the insurance contract.

53 F.3d at 1169.  A federal court is not required to refuse jurisdiction, but it "should not entertain a declaratory judgment action over which it has jurisdiction if the same fact-dependent issues are likely to be decided in another pending proceeding."  St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d at 1170.  A federal court may abstain from exercising jurisdiction over a declaratory judgment action if "the plaintiff is using the action for procedural fencing."  St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d at 1170.  The Tenth Circuit noted that the

insurance-company plaintiff's timing of filing suit "may not necessarily be bad faith on [its] part," but found that the insurance-company plaintiff was unable to show error in the district court's perception that it was using the declaratory judgment action for procedural fencing or "to provide an arena for a race to res judicata." St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d at 1170 (emphasis in original).

In State Farm Fire & Casualty Co. v. Mhoon, Robert Mhoon's shooting of Takuro Fujiwara resulted in three lawsuits. See 31 F.3d at 981. Fujiwara and his wife filed suit in state court on November 2, 1990, alleging that Mhoon committed intentional torts against them. See 31 F.3d at 982. State Farm, Mhoon's insurer, agreed to defend him against the Fujiwaras, "but only under a reservation of rights which left State Farm free to seek a judicial determination of its contractual obligations to Mhoon." 31 F.3d at 982. On June 12, 1991, State Farm filed a declaratory judgment action under 28 U.S.C. § 2201 and sought declaration that Mhoon was not covered under the policy because he shot Fujiwara intentionally. See State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d at 982. "Though the state tort suit between Mhoon and [Fujiwara] was still in progress at the time, the federal district judge agreed to hear State Farm's declaratory action." 31 F.3d at 982. The federal district court ruled, as a matter of law, that Mhoon intentionally shot Fujiwara. See 31 F.3d at 982.

> The critical question whether Mhoon acted intentionally was before both the state and federal courts simultaneously and the federal court's failure to await the state court's resolution of the issue opened the possibility that the state court would be foreclosed from deciding that Mhoon behaved only negligently and was, thus, entitled to be insured and defended.

31 F.3d at 983.

The Tenth Circuit in State Farm Fire and Casualty Co v. Mhoon held that the federal district court did not abuse its discretion by hearing the case, because "a live need for declaration

of State Farm's rights and duties did, in fact, exist." 31 F.3d at 983-84. The Tenth Circuit based its decision on three factors: (i) neither party suggested that State Farm could have been or was a party to the state tort action, "thus obviating the need for an independent declaratory action and providing a simpler and more efficient resolution of State Farm's obligations towards Mhoon"; (ii) there was substantial interest in deciding the question of duty to defendant without delay; and (iii) the federal district court was an available forum to State Farm. 31 F.3d at 984. The Tenth Circuit noted that the federal court's exercise of jurisdiction did not unduly interfere with the state proceeding. See 31 F.3d at 984. The federal court's decision on State Farm's duty "involved no matter, factual or legal, at issue in the state case." 31 F.3d at 984. The coverage issue was not a complicated one and involved only a search of the record to determine whether Mhoon's conduct was accidental under the insurance policy. See 31 F.3d at 984. "[It] was not a case, therefore, where the district court found a material factual dispute and proceeded to resolve it in the face of ongoing state proceedings on the same subject." 31 F.3d at 984. The Tenth Circuit stated that that scenario would have presented a different issue, especially if the state proceedings were quite far along. Under those circumstances, a stay or dismissal might be proper. See 31 F.3d at 984.

In 2006, the Honorable Bobby Baldock, Senior United States Circuit Judge, sitting by designation on the United States District Court for the District of New Mexico, denied the defendants' motion to dismiss, but granted the defendants' request to stay the proceedings. See Progressive Specialty Ins. Co. v. Thakur, Order Denying Defendants' Motion to Dismiss But Allowing Defendants' Alternative Motion to Stay Proceedings, No. CIV 06-0542 BRB/RHS (D.N.M. November 14, 2006)(Doc. 14)("Thakur Order"). In Progressive Specialty Ins. Co. v. Thakur, the insurance company sought declaratory judgment that the total amount of coverage

owed to the insured was $50,000.00.  See Thakur Order at 2.  The insured counterclaimed,

seeking a declaration of rights and obligations, reformation of the insurance contract, and

monetary damages for breach of contract, negligence, bad-faith dealing, and violation of the New

Mexico Insurance Code and Unfair Practices Act.  See Thakur Order at 2.  The insured also

responded to the insurance company's suit in federal court by filing his own suit against the

insurance company in state court.  See Thakur Order at 2.  The insured named an additional

defendant that he contended was a necessary and indispensable party to the federal lawsuit.  See

Thakur Order at 2. The additional defendant was the insurance agency that sold the insurance

policy to the insured.  See Thakur Order at 2.  Both the insured and the agency were New

Mexico residents, and the joinder of the insurance agency "effectively destroyed diversity

jurisdiction and the possibility of removal from state court." Thakur Order at 2.  Although the

insured's state lawsuit was "broader in scope," it essentially raised issues identical to the

insurance company's federal lawsuit.  Thakur Order at 3.

Judge Baldock determined that "the state proceeding, unlike [the federal lawsuit],

appear[s] to encompass the entire controversy by addressing both [the insurance company's] and

[the insurance agent's] potential liability to [the insured]." Thakur Order at 5.  "In other words,

the rights and obligations of all concerned parties may be adjudicated only in the state action,"

while the federal lawsuit "might lead to piecemeal litigation thereby undermining both federal

and state interests in practicality and wise judicial administration." Thakur Order at 5 (internal

quotations omitted and emphasis in original).  Judge Baldock explained that, for the same

reasons, "the state remedy appears to be the most effective.  Because the state action [would]

likely decide the rights of all interested parties, including the parties to the [federal action], such

remedy necessarily is more comprehensive and cohesive." Thakur Order at 6.  Judge Baldock

did not believe that the federal lawsuit provided the insured with an effective remedy, "because he might very well have to argue factually and legally similar issues against [the insurance agency] in state court." Thakur Order at 6.

More importantly, Judge Baldock explained that the case presented "purely questions of state law including the interpretation of the state's insurance code." Thakur Order at 6. "The State of New Mexico has the predominant interest in deciding a matter involving an insurance policy issued within the state to a state resident involved in an auto accident on a state thoroughfare." Thakur Order at 6. Judge Baldock did not dismiss the case, but stayed it, because "a stay avoids problems which might arise if application of a time bar might prevent [the insurance company] from refiling its federal action." Thakur Order at 7.

The Supreme Court resolved a clash among the circuits concerning whether a district court's decision to dismiss a federal declaratory judgment action in favor of parallel state litigation is governed by the discretionary standard of Brillhart v. Excess Insurance Co., or the "exceptional circumstances" test in Colorado River. See Wilton v. Seven Falls Co., 515 U.S. 277, 285 (1995); Youell v. Exxon Corp., 74 F.3d 373, 375 (2d Cir. 1996). The Supreme Court held that district courts should apply the Brillhart test, finding that "[d]istinct features of the Declaratory Judgment Act . . . justify a standard vesting district courts with greater discretion in declaratory judgment actions than that permitted under the 'exceptional circumstances' test of Colorado River." Wilton, 515 U.S. at 286.

## LAW REGARDING <u>YOUNGER</u> ABSTENTION AND CLAIMS FOR MONEY DAMAGES

Under the abstention doctrine that the Supreme Court articulated in Younger, "federal courts should not 'interfere with state court proceedings' by granting equitable relief -- such as injunctions of important state proceedings or declaratory judgments regarding constitutional

issues in those proceedings" -- when the state forum provides an adequate avenue for relief. Weitzel v. Div. of Occupational & Prof'l Licensing, 240 F.3d 871, 875 (10th Cir. 2001)(quoting Rienhardt v. Kelly, 164 F.3d 1296, 1302 (10th Cir.1999)). Younger abstention is not a doctrine only belonging to courts of equity, although the doctrine arose from parties seeking equitable relief from state court proceedings in federal court. The Tenth Circuit has "not treated abstention as a 'technical rule of equity procedure,' [r]ather, [it has] recognized that the authority of a federal court to abstain from exercising its jurisdiction extends to all cases in which the court has discretion to grant or deny relief." Morrow v. Winslow, 94 F.3d 1386, 1392 (10th Cir. 1996)(quoting Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716-17 (1996)). This refusal to exercise federal jurisdiction arises from a desire to "avoid undue interference with states' conduct of their own affairs." J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1291 (10th Cir. 1999)(quoting Seneca-Cayuga Tribe v. Oklahoma, 874 F.2d 709, 711 (10th Cir. 1989)).

For Younger abstention to be appropriate, the Tenth Circuit has ruled that three elements must be present: (i) interference with an ongoing state judicial proceeding; (ii) involvement of important state interests; and (iii) an adequate opportunity afforded in the state court proceedings to raise the federal claims. See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432 (1982)("Middlesex")); Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d 1162, 1177-78 (10th Cir. 2001). When all of the elements mandating abstention clearly exist in the record, courts may, and should, address application of the Younger abstention doctrine sua sponte. See Bellotti v. Baird, 428 U.S. 132, 143 n.10 (1976)(stating that "abstention may be raised by the court sua sponte"); Morrow v. Winslow, 94 F.3d 1386, 1390-91 & n. 3 (10th Cir. 1996)(raising and applying Younger abstention doctrine sua sponte, and holding that parties need not raise the Younger abstention

doctrine to preserve its applicability).

"Younger abstention is not discretionary once the [three] conditions are met, absent extraordinary circumstances that render a state court unable to give state litigants a full and fair hearing on their federal claims." Seneca-Cayuga Tribe v. Oklahoma, 874 F.2d 709, 711 (10th Cir. 1989)(citation omitted). See Taylor v. Jaquez, 126 F.3d 1294, 1296 (10th Cir. 1997)(holding that, because "'application of the Younger doctrine is absolute . . . when a case meets the Younger criteria,' there is no discretion for the district court to exercise."). When the elements of Younger abstention are met, a district court should dismiss the claims before it, unless a petitioner has brought claims which "cannot be redressed in the state proceeding," in which case the district court should stay the federal proceedings pending the conclusion of the state litigation. Deakins v. Monaghan, 484 U.S. 198, 194 (1988). For example, where a party brings a claim for damages under 42 U.S.C. § 1983, as well as a request for equitable relief from a state court proceeding, a federal district court should dismiss the claims for equitable relief under Younger, but stay the complaint with respect to the damages claim, since § 1983 is exclusively a federal cause of action. See Myers v. Garff, 876 F.2d 79, 81 (10th Cir. 1989)(holding that a district court was right to dismiss claims for declaratory and injunctive relief, but that the district court should have stayed claims for damages under § 1983 against defendants until the state court proceedings ended). See also Younger v. Harris, 401 U.S. at 43 (holding that the federal courts must dismiss suits requesting declaratory or injunctive relief when there are pending state criminal proceedings).

On the other hand, where a state court can address a plaintiff's causes of action, a federal court should abstain and dismiss the case even if the plaintiff requests monetary damages in addition to injunctive relief from the state court proceeding. In Wideman v. Colorado, 242 F.

App'x 611 (10th Cir. 2007), the Tenth Circuit considered a parent's complaints alleging ongoing

violations arising from the Colorado state courts' adjudication of his child custody rights.  See

242 F. App'x at 613.  The parent had requested a federal district court to issue an order regarding

his parental rights and rights to child support payments, and to award the parent monetary

damages recompensing him for his past child support payments.  See 242 F. App'x at 611.

Additionally, the parent alleged that the Colorado state trial and appellate courts had treated him

with "disrespect" on account of his gender and race, and he brought a § 1983 case in federal

court seeking money damages from the state court officials adjudicating his state custody case.

242 F. App'x at 613.  The Tenth Circuit ruled that the district court was right to abstain from

hearing the parent's case under Younger v. Harris.  See 242 F. App'x at 614.  The Tenth Circuit

explained that the parent's "complaints assert claims that involve matters still pending in

Colorado state courts," as the custody proceedings were ongoing.  242 F. App'x at 614.  Further,

the dispute implicated "important state interests," because the parent's complaints covered

domestic relations issues.  242 F. App'x at 614.  Last, the Tenth Circuit found that the parent had

"an adequate opportunity to litigant any federal constitutional issues that may arise . . . in the

Colorado state proceedings."  242 F. App'x at 614.  Thus, where the criteria for Younger

abstention are otherwise met, even if a party requests monetary damages, a federal court in the

Tenth Circuit must abstain from adjudicating the entire case while state proceedings are ongoing.

## LAW REGARDING THE NMTCA

The New Mexico Legislature enacted the NMTCA, because it recognized "the inherent

unfair and inequitable results which occur in the strict application of the doctrine of sovereign

immunity."  N.M. Stat. Ann. § 41-4-2(A).  The New Mexico Legislature also recognized,

however,

> that while a private party may readily be held liable for his torts within the chosen ambit of his activity, the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done.

N.M. Stat. Ann. § 41-4-2(A).  As a result, it was "declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act." N.M. Stat. Ann. § 41-4-2(A).  The NMTCA is also "based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." N.M. Stat. Ann. § 41-4-2(C).

> The NMTCA is the
>
> exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act and no other claim, civil action or proceeding for damages, by reason of the same occurrence, may be brought against a governmental entity or against the public employee or his estate whose act or omission gave rise to the suit or claim.

N.M. Stat. Ann. § 41-4-17(A).  A plaintiff may not sue a New Mexico governmental entity, or its employees or agents, unless the plaintiff's cause of action fits within one of the exceptions to immunity that the NMTCA grants.  See Begay v. State, 1985-NMCA-117, 723 P.2d 252, 255 ("Consent to be sued may not be implied, but must come within one of the exceptions to immunity under the Tort Claims Act."), rev'd on other grounds by Smialek v. Begay, 1986-NMSC-049, 721 P.2d 1306.  A plaintiff also may not sue a governmental entity or its employees for a damage or damages claim arising out of violations of rights under the New Mexico Constitution unless the NMTCA contains a waiver of immunity.  See Barreras v. N.M. Corr. Dep't, 2003-NMCA-027, ¶ 24, 62 P.3d 770, 776 ("In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express

waiver of immunity under the Tort Claims Act."); Chavez v. City of Albuquerque, 1998-NMCA-004, ¶ 8, 952 P.2d 474 (noting that a plaintiff cannot seek damages for violations of rights under the New Mexico Constitution against a city or its employees or agents unless the NMTCA waives immunity); Rubio v. Carlsbad Mun. Sch. Dist., 1987-NMCA-127, ¶ 13, 744 P.2d 919, 922 (holding that no waiver of immunity exists for damages arising out of alleged educational malpractice claim against a school board); Begay v. State, 1985-NMCA-117, ¶ 14 (finding that no waiver exists in NMTCA for suit under Article II, § 11 of the New Mexico Constitution). "Thus, if no specific waiver can be found in the NMTCA, a plaintiff's complaint against the governmental entity or its employees must be dismissed." Salazar v. City of Albuquerque, No. CIV 10-0645 JB/ACT, 2013 WL 5554185, at *24 (D.N.M. Aug. 20, 2013)(Browning, J.)(citing Begay v. State, 1985-NMCA-117).

## ANALYSIS

The Court will grant Gerhardt's Surreply Motion so that Gerhardt may sharpen his arguments.  The Court will grant the Woods Motion for two reasons.  First, qualified immunity protects Woods from Gerhardt's claims, because there was no constitutional violation and the law was not clearly established.  Second, Gerhardt fails to state a claim under rule 12(b)(6), because his allegations that Woods participated in a conspiracy are conclusory.  The Court will grant the Commission Motion.  Although Younger abstention and the Declaratory Judgment Act's discretion do not prevent the Court from hearing the case, ripeness concerns and certain Defendants' quasi-judicial immunity pose insurmountable bars to success.  Moreover, the Court concludes that the Racing Commission Defendants are immune from Gerhardt's state civil conspiracy and prima facie tort claims.  The Court will dismiss Gerhardt's claims against Woods with prejudice.   The Court will dismiss Gerhardt's federal claims against the Racing

Commissioners with prejudice because of their quasi-judicial immunity.  The Court will dismiss Gerhardt's federal claims against Keiter and Mares without prejudice.  Finally, the Court will dismiss Gerhardt's state claims against the Racing Commission Defendants with prejudice.

I.  **WOODS DID NOT VIOLATE GERHARDT'S CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS AND IS THUS ENTITLED TO QUALIFIED IMMUNITY.**

To recover against Woods, Gerhardt must demonstrate, based on the facts alleged in his Complaint, "both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity."[17]  Riggins v. Goodman, 572 F.3d at 1107.  Gerhardt has not sufficiently alleged that Woods violated his constitutional rights and, in any case, the law on those rights is unsettled.  Woods is thus entitled to qualified immunity.

The Court will follow the process that Saucier v. Katz outlined, first determining whether Woods' actions violated the Constitution and then, assuming any rights were violated, determining whether they were clearly established.  See 533 U.S. at 201.  Although the Court recognizes that this approach is no longer mandatory, it believes that it will be "beneficial" under the circumstances.  Pearson v. Callahan, 555 U.S. at 236.  Specifically, there "would be little if any conservation of judicial resources" here because it would be "difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right

---

[17]The Complaint did not explain whether it targets Woods in his official capacity, his individual capacity, or both.  See Woods Motion at 8.  The Woods Motion thus contends that sovereign immunity bars Gerhardt's claim against Woods in his official capacity.  See Woods Motion at 9-13.  At the hearing, the Court confirmed that Gerhardt brings only "a conspiracy claim for violation of federal constitutional rights under 1983 and it's limited to that."  Tr. at 5:10-23 (Court, Richards).  Gerhardt also stated that he is not suing Woods in an official capacity and that the NMTCA is irrelevant.  See Tr. at 5:10-23 (Court, Richards).  The Court will thus not discuss these arguments in this opinion.  Gerhardt may, of course, maintain his federal constitutional claims against Woods in Woods' individual capacity.  See Ex parte Young, 209 U.S. 123, 163 (1908).

happens to be." Pearson v. Callahan, 555 U.S. at 236 (quoting Lyons v. Xenia, 417 F.3d 565, 581 (6th Cir. 2005)(Sutton, J., concurring)).  It is difficult to decide precisely what law is or is not clearly established unless the Court determines, as best it can, whether there is even a constitutional right at issue, what it is, what its scope is, and whether, under the facts and circumstances here, it was violated.  This matter involves a recurring fact pattern, although unlikely exactly the same, requiring guidance on the challenged conduct's constitutionality which will only face challenges in the qualified immunity context.  It is, in short, an appropriate case to "avoid avoidance," Camreta v. Greene, 131 S. Ct. at 2031, because the exercise of determining whether Woods violated Gerhardt's constitutional rights will help the Court determine whether the law was clearly established.  The Court will thus address whether any constitutional violations occurred before discussing whether the law was clearly established.

## A.   WOODS DID NOT VIOLATE GERHARDT'S CONSTITUTIONAL RIGHTS.

To determine whether Woods violated Gerhardt's rights, the Court must first identify the relevant right and Woods' actions.  See Binay v. Bettendorf, 601 F.3d 640, 650 (6th Cir. 2010)("Each defendant's liability must be assessed individually based on his own actions.").  The Complaint identifies only Woods' "constitutional rights to due process" and "equal protection under the law."  Complaint ¶ 101, at 13.  The Court will use Gerhardt's most narrow definition -- "the right of a horse owner to engage in the chosen profession of racing."  Tr. at 73:17-19 (Richards).  This definition is consistent with the Court of Appeals of New Mexico's prior decision in Stinebaugh v. New Mexico Racing Commission:

> [A]lthough a license to own and train race horses is a privilege, and not a vested right to which the due process clauses of the state and federal constitutions necessarily attach, *Sanderson v. N.M. Racing Comm'n,* 1969–NMSC–031, ¶ 7, 80 N.M. 200, 453 P.2d 370, a horse's jockey, owner, or trainer has a right to engage

in his chosen profession and is entitled to due process of law if he is to be lawfully denied an opportunity to do so.

2015 WL 4874288, at *2 (internal quotations omitted). Gerhardt describes Woods' involvement in various ways in his briefing, but the Complaint's account of Woods' actions boils down to a few allegations:

107. Upon information and belief, the individual Defendant Commissioners enlisted Roscoe Woods and others, to assist them in gathering information to further deprive Plaintiff of his property interests and further the harm caused by procedural violations of NMRC employees.

108. Roscoe Woods had no authority or intent to resolve the NMRC's improper actions or liability at such time.

109. Roscoe Woods, on behalf of Defendant Commissioners, used such meeting solely to gather information by which to influence and/or change the hearing officer's decision.

Complaint ¶¶ 107-109, at 14. In short, Gerhardt alleges that Woods participated in a settlement conference without authority to resolve the dispute and solely to gather information on the Gerhardt's case. See Reply at 9. Gerhardt fails to cite any cases holding an attorney liable for participating in a settlement conference in bad faith or even any cases holding an opposing party's counsel liable for any reason. See Woods Response at 1-20. As in Tapia v. City of Albuquerque, 10 F. Supp. 3d 1323 (D.N.M. 2014)(Browning, J.), Gerhardt "has cited no authority that holds that such acts violate any constitutional provision." 10 F. Supp. 3d at 1406. The Court's search for relevant cases revealed many that reached an opposite result. In Karnatcheva v. JPMorgan Chase Bank, N.A., 871 F. Supp. 2d 834 (D. Minn. 2012)(Davis, J.), for example, the United States District Court for the District of Minnesota explained:

An "attorney acting within the scope of his employment as an attorney is immune from liability to third persons for actions arising out of that professional relationship." McDonald v. Stewart, 289 Minn. 35, 182 N.W.2d 437, 440 (1970). Further, attorneys are generally not liable to the client's adversary, absent evidence of an affirmative misrepresentation.

871 F. Supp. 2d at 839.  The Court concludes that an attorney does not violate an opposing party's constitutional rights by attending a settlement conference, even if it is solely in order to learn more about an opponent's case, or by otherwise attending in bad faith.  State attorneys should have some leeway to maneuver, and if the parties do not want to attend, they do not have to attend.  The state attorney is not making them attend.  Given that he has no power to compel, there is no state compulsion; only an invitation, whether it is called a settlement conference, a meet and confer, or something else.[18]  State attorneys may talk to the other side without fear of being sued for constitutional violations.

### B.    EVEN IF WOODS VIOLATED GERHARDT'S CONSTITUTIONAL RIGHTS, THESE RIGHTS WERE NOT CLEARLY ESTABLISHED.

Even if the Court could, on the record before it, conclude, as a matter of law, that Woods violated Gerhardt's constitutional rights, the Court concludes that the law was not clearly established such that a reasonable attorney in Woods' position would have recognized the unlawfulness of his decision to participate in the settlement conference.[19]

Qualified immunity provides broad protection for government officials where "their conduct does not violate clearly established statutory or constitutional rights of which a

---

[18]Many court orders mandating settlement conferences require the parties to have full "settlement authority" for negotiations.  See Carlsbad Hotel Associates, L.L.C. v. Patterson-UTI Drilling Co., L.P., L.L.L.P., 2009-NMCA-005, ¶ 9, 199 P.3d 288, 292; Schwartzman, Inc. v. ACF Indus., Inc., 167 F.R.D. 694, 698 (D.N.M. 1996)(stating that this requirement "applies to the government as well as private litigants").  A state attorney's decision to appear at a settlement conference without settlement authority may subject him to a court's penalties, but it does not constitute a constitutional violation.

[19]The Court's conclusion that Woods did not violate Gerhardt's constitutional rights, of course, means that it cannot conclude that these rights were clearly established.  See Tapia v. City of Albuquerque, 10 F. Supp. 3d at 1410 ("The Court has, for the reasons it has explained, concluded that Ms. Forney has not violated the Plaintiffs' constitutional rights. It necessarily follows that the Plaintiffs did not demonstrate that Ms. Forney violated their clearly established constitutional rights.").

reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). The Supreme Court requires district courts "not to define clearly established law at a high level of generality[,]" and that they should focus on "whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084 (requiring that the "contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.")(emphasis added). It operates to protect officials from the law's "hazy border" and shields officers with "reasonable, but mistaken beliefs." Saucier v. Katz, 533 U.S. at 205. "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)(Murphy, J.).

As the Tenth Circuit has emphasized, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183 (emphasis added).

Gerhardt has not cited any cases on point. When the Court asked him for his best case, he mentioned three: Kvech v. New Mexico Dep't of Pub. Safety, 987 F. Supp. 2d 1162 (D.N.M. 2013)(Browning, J.); Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323 (10th Cir. 2007); and Stinebaugh v. N.M. Racing Comm'n, 2015 WL 4874288. Kvech v. New Mexico Department of Public Safety involved a state employee's failure to remove a plaintiff from New Mexico's sex offender registry. See 987 F. Supp. 2d at 1166. Even then, the Court found that the law on "what

process, if any, was due a person who had been convicted of a sex offense in state A, was required to register as a sex offender in state A, and moved to state B with different sex offender registration requirements" was not clearly established.  987 F. Supp. 2d at 1206.  <u>Casey v. West Las Vegas Independent School District</u> involved a school superintendent's First Amendment retaliation claim against a school district and its officials.  <u>See</u> 473 F.3d at 1326.  The Tenth Circuit concluded that some of the superintendent's speech was a viable basis for her claim.  <u>See</u> 473 F.3d at 1334.  <u>Stinebaugh v. New Mexico Racing Commission</u> involved a challenge to a Racing Commission decision and held that "our case law is clear that an agency's failure to comply with its own regulations in rendering a decision is a basis for voiding that decision." 2015 WL 4874288, at *3.  It was, however, a state decision involving a clear violation of Racing Commission regulations and did not discuss qualified immunity at all.  <u>See</u> 2015 WL 4874288, at *3.  None of these cases stand for the proposition that an attorney cannot participate in a settlement conference, even without the authority to actually resolve the dispute and only to gather information about a plaintiff's case.

## II. GERHARDT'S COMPLAINT DOES NOT STATE A CLAIM AGAINST WOODS UNDER RULE 12(b)(6) BECAUSE HIS ALLEGATIONS THAT WOODS PARTICIPATED IN A CONSPIRACY TO VIOLATE HIS CIVIL RIGHTS ARE <u>CONCLUSORY AND IMPLAUSIBLE.</u>

A "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  <u>Bell Atl. Corp v. Twombly</u>, 550 U.S. at 555 (citation omitted).  "[T]he mere metaphysical possibility that some plaintiff could prove some set of facts in support of the

pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(Kelly, J.)(emphasis omitted).

Gerhardt has adequately alleged that Woods acted under color of law. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. at 48. Woods contends that the "Plaintiff fails to allege . . . that Mr. Woods or any other Defendant who engaged in the supposed conspiracy against Plaintiff acted under color of law; for that reason alone, Plaintiff fails to make out a claim for civil conspiracy under 42 U.S.C. § 1983." Woods Motion at 13 (internal citations omitted). The Court disagrees. The Complaint does not use magic words, but Woods' cited cases do not require them. See Van Loo v. Braun, 940 F. Supp. 1390, 1399 (E.D. Wis. 1996)(Warren, J.); Runco Transp., Inc. v. Mid Valley Sch. Dist., No. 3:CV-14-1261, 2015 WL 672260, at *5 (M.D. Pa. Feb. 17, 2015)(Caputo, J.). Courts do not require use of the phrase "under color of law." E.g. Cabrera v. Martin, 973 F.2d 735, 745 (9th Cir. 1992)("We therefore find no reason to reverse the district court on the grounds that the appellees failed to plead § 1983 as a basis of their complaint or because they failed to use the magic words 'under color of state law' when bringing their complaint."). Gerhardt identifies Woods as a state employee and states that he acted "on behalf of Defendant Commissioners." Complaint ¶ 109, at 14.

Gerhardt also identifies a protected property or liberty interest. "To state a claim for a violation of due process, [a] plaintiff must first establish that it has a protected property interest and, second, that defendants' actions violated that interest." Crown Point I, LLC v. Intermountain Rural Elec. Ass'n, 319 F.3d 1211, 1216 (10th Cir. 2003). Gerhardt has not

attempted to establish a property interest in the "first-place winner's prizes and benefits as their property," Simon v. Taylor, 981 F. Supp. 2d at 1065, or a license to race one's horse, see Sanderson v. New Mexico Racing Comm'n, 1969-NMSC-031, ¶ 7, 453 P.2d at 372.   As discussed above, however, "a horse's jockey, owner, or trainer has a right to engage in his chosen profession and is entitled to due process of law if he is to be lawfully denied an opportunity to do so."  Stinebaugh v. N.M. Racing Comm'n, 2015 WL 4874288, at *2 (internal quotations omitted).  Gerhardt has met the requirement to identify a property or liberty interest.

Gerhardt has failed, however, to plead that Woods participated in a conspiracy to violate this right.  The Tenth Circuit has stated that "a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants.  'Conclusory allegations of conspiracy are insufficient to state a valid § 1983 claim.'"  Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 533 (10th Cir. 1998)(quoting Hunt v. Bennett, 17 F.3d 1263, 1266 (10th Cir. 1994)).  The Complaint includes only three paragraphs on Woods' participation in the alleged conspiracy, and fails to include any specific facts showing that the Defendants agreed or conspired to harm Gerhardt.  See Complaint ¶¶ 107-109, at 14.  As Woods points out, the Court does now know what "'machinations' . . . Mr. Woods and the other Defendants [took] in furtherance of their apparently vast conspiracy against Plaintiff and his sorrel gelding[.]"  Woods Reply at 10.  The Complaint's allegations are the "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," that the Supreme Court has held to be insufficient. Ashcroft v. Iqbal, 556 U.S. at 678.  See Tapia v. City of Albuquerque, 10 F. Supp. 3d at 1320 ("This claim amounts to nothing more than [c]onclusory allegations of conspiracy, which are insufficient to state a valid § 1983 claim.")(quotations omitted).

III.    RIPENESS AND QUASI-JUDICIAL IMMUNITY, BUT NOT <u>YOUNGER</u> ABSTENTION OR THE DECLARATORY JUDGMENT ACT, BAR GERHARDT'S FEDERAL CLAIMS AGAINST THE RACING COMMISSION DEFENDANTS.

Ripeness concerns and certain Defendants' quasi-judicial immunity bar Gerhardt's federal claims against the Racing Commission Defendants. <u>Younger</u> abstention and the Declaratory Judgment Act, on the other hand, have no effect.

### A.    GERHARDT'S CLAIMS ARE NOT RIPE FOR JUDICIAL REVIEW.

Ripeness is a component of the Article III requirement that limits judicial review to "cases or controversies." U.S. Const. art. III, § 2. <u>See</u> <u>U.S. West, Inc. v. Tristani</u>, 182 F.3d at 1208. The doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." <u>Abbott Labs. v. Gardner</u>, 387 U.S. at 148-49. Courts must consider: "1) whether delayed review would cause hardship to the plaintiffs; 2) whether judicial intervention would inappropriately interfere with further administrative action; and 3) whether the courts would benefit from further factual development of the issues presented." <u>Sierra Club v. U.S. Dep't of Energy</u>, 287 F.3d at 1262-63.

Most importantly, judicial intervention would inappropriately interfere with further administrative action. Although the hearing officer has issued her Initial Recommendation, the Racing Commissioners have remanded it, and they will ultimately review any resulting changes. If the Court held on the merits that the Racing Commission's actions violated its own rule, or that it applied the rule inconsistently, it "would be resolving a nullity if further administrative action would have afforded . . . a less dire" outcome. <u>Utah v. U.S. Dep't of Interior</u>, 535 F.3d 1184, 1196 (10th Cir. 2008). Gerhardt notes that the "factual and administrative record is

completely developed, save for the Commission's decision."  Response at 4.  This argument, however, overlooks the possibility that remand could secure additional evidence and the fact that the Court still lacks the agency's decision.  The Racing Commission has "specialized expertise," and the Court is reluctant to cut off its decision-making process before it has "formulated a definitive course of action."  Gordon v. Norton, 322 F.3d 1213, 1221-22 (10th Cir. 2003).

The Court would also benefit from further factual development of the issues presented because this matter is not purely legal.  Gerhardt has raised factual issues, including whether the Racing Commission applied its Breed Certificate Rule consistently to all of horses involved in the May 24, 2014 race.  See Tr. at 56:13-57:14 (Richards).  This inquiry could involve questions of fact as to the specific horses involved in the race, Defendant Keiter's actions as to those horses, and whether the enforcement targeted trainer Stinebaugh.  See Hearing Officer's Report, filed September 10, 2015 (Doc. 1-2)("Hearing Officer Report")(not answering these questions).  The Racing Commission should have the opportunity to further investigate these issues.  See Gordon v. Norton, 322 F.3d 1213, 1220 (10th Cir. 2003)(noting that the court "would [] be required to examine related issues which require further factual development").

Finally, delayed review would not cause hardship to Gerhardt.  The Defendants contend that the injury to Gerhardt is complete -- that the "narrow question Plaintiff has pending with the Racing Commission is what, if anything, it will do about Plaintiff's horse having been disqualified from a race that was run and concluded in May 2014."  Commission Motion at 6. Gerhardt views the harm differently, defining it to include his horse's ineligibility for future races.  See Tr. at 58:12-15 (Richards).  Under either definition, however, Gerhardt will not experience greater harm if the Court waits for a decision from the Racing Commission.

Cases finding that delayed review would cause hardship to the plaintiffs tend to involve very different facts.  In Swepi, LP v. Mora Cty., N.M., 81 F. Supp. 3d 1075 (D.N.M. 2015)(Browning, J.), for example, the Court found that an ordinance would chill First Amendment activities and thus impose harm on the plaintiff absent a prompt review.  See 81 F. Supp. 3d at 1164.  The Tenth Circuit reached a similar conclusion on a New Mexico statute that prohibited the use of campaign contributions solicited for federal election campaigns in state campaigns.  See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1500 (10th Cir. 1995)("In assessing the hardship of forestalling judicial resolution of the constitutionality of the New Mexico statute, our inquiry must focus on whether the challenged action creates a direct and immediate dilemma for the parties.")(internal quotations omitted).  Courts are unwilling to require regulated entities to "gamble millions of dollars on an uncertain state of law" and thus generally allow challenges to expensive regulations before enforcement.  Nebraska Pub. Power Dist. v. MidAmerican Energy Co., 234 F.3d 1032, 1038 (8th Cir. 2000).  See Abbott Labs. v. Gardner, 387 U.S. at 156.  "Harm includes the heightened uncertainty and resulting behavior modification that may result from delayed resolution, as well as traditional types of harm recognized by the courts."  Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1190 (D.N.M. 2010)(Browning, J.).  For example, the Tenth Circuit has concluded that a state bar requirement that students divulge information on drug and alcohol dependency and mental health issues had a "direct and immediate impact" on applicants to admission for the bar.  Roe No. 2 v. Ogden, 253 F.3d 1225, 1231 (10th Cir. 2001).

Gerhardt's claim is distinguishable from these cases.  The  Court's refusal to immediately review his claim will not create uncertainty for him or force him to bet resources on a particular outcome.  See Abbott Labs. v. Gardner, 387 U.S. at 156.  It will not chill any protected speech.

See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1500.  The harm to Gerhardt will be identical even if the dispute is not resolved for many months.

The Court acknowledges Gerhardt's concern about the "ongoing" nature of the Racing Commission's investigation.   Commission Response at 3-5 ("Requiring Plaintiff to exhaust administrative remedies already exhausted and already trapped in procedural gamesmanship by the Commission after having received Notice of the pendency of Section 1983 litigation is the epitome of the futility considered as an exception to exhaustion.").  The relevant events occurred on May 24, 2014.  See Complaint ¶ 14, 16, at 2-3.  The hearing officer reached a decision on December 16, 2014.  See Hearing Officer Report at 8.  The Racing Commissioners considered the Report in a closed session and voted to "take this matter under advisement" on March 12, 2015.  Complaint ¶ 50, 54, at 6.  Wood met with Gerhardt on July 8, 2015.  See Complaint ¶ 106, at 14.  On July 22, 2015, the Racing Commissioners held a closed meeting to discuss the matter. See Complaint ¶ 112, at 14-15.  The Racing Commissioners then remanded the matter for further examination without explanation "as to how such process was to proceed or the reasons/purposes for a remand."  Complaint ¶ 113, at 25.  The matter has thus been pending before the Racing Commission for more than a year without any final or substantive decision.[20]   The Racing Commission seems to be dragging its feet, avoiding a decision in the hopes of deflecting litigation.  See Tr. at 61:22-23 (Court).

The Racing Commission Defendants' behavior has put the Court in a difficult position. The Racing Commission urges the Court to defer any action, but it does not take any action.  See

---

[20]The Racing Commission Defendants contend that the issue's "uniqueness" and their recent remand justify this delay.  Tr. at 63:17-21 (Howell).  The Court finds neither of these explanations convincing.  The issue seems relatively straightforward, and any uniqueness is because of the Racing Commission's decision to not enforce the Breed Certificate Rule consistently over a period of years.  See Complaint ¶ 43, at 5-6.  Moreover, the remand included no detail and should not have required so much time to produce.

Tr. at 63:2-8 (Court).  The Court cannot find, at least at this time, that the Racing Commission's lack of action yet constitutes a denial, ends the proceedings, or nullifies the Court's normal deference to administrative action.  The Court adds, however, that at some point, this situation will change.

### B.      YOUNGER ABSTENTION DOES NOT BAR GERHARDT'S CLAIMS.

Younger abstention holds that "federal courts should not 'interfere with state court proceedings' by granting equitable relief -- such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings" -- when the state forum provides an adequate avenue for relief.   Weitzel v. Div. of Occupational & Prof'l Licensing, 240 F.3d 871, 875 (10th Cir. 2001)(quoting Rienhardt v. Kelly, 164 F.3d 1296, 1302 (10th Cir.1999)).  For Younger abstention to be appropriate, the Tenth Circuit has ruled that three elements must be present: (i) interference with an ongoing state judicial proceeding; (ii) involvement of important state interests; and (iii) an adequate opportunity afforded in the state court proceedings to raise the federal claims.  See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex, 457 U.S. at 432); Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d at 1177-78.  "Younger abstention is non-discretionary; it must be invoked once the three conditions are met, absent extraordinary circumstances."  Amanatullah v. Colo. Bd. of Med. Examiners, 187 F.3d at 1163.

Before examining the three-factor test, the Court must first address whether this case is one that allows for Younger abstention at all.  The Supreme Court has defined the appropriate set of cases narrowly:

> Circumstances fitting within the *Younger* doctrine, we have stressed, are "exceptional"; they include, as catalogued in [New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350 (1989)], "state criminal prosecutions," "civil enforcement proceedings," and "civil proceedings involving

certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.

Sprint Commc'ns, Inc. v. Jacobs, 134 S. Ct. 584, 588 (2013)("Sprint")(quoting New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. at 368).  In Sprint, the Supreme Court discussed the significance of its earlier decision in Middlesex.  The defendants read Middlesex to require abstention "whenever three conditions are met: There is (1) "an ongoing state judicial proceeding, which (2) implicates important state interests, and (3) . . . provide[s] an adequate opportunity to raise [federal] challenges." Sprint, 134 S. Ct. at 593.  The Supreme Court corrected them, explaining that "[t]he three *Middlesex* conditions recited above were not dispositive; they were, instead, *additional* factors appropriately considered by the federal court before invoking *Younger*." Sprint, 134 S. Ct. at 593 (emphasis in original).  The Supreme Court's opinion is in tension with the Tenth Circuit's existing cases, which rely only on a three-factor test that cites Middlesex and allows for a broader variety of appropriate cases.  See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291; Amanatullah v. Colo. Bd. of Med. Examiners, 187 F.3d at 1163.  Other district courts within the Tenth Circuit have recognized the same problem, but the Tenth Circuit has not yet addressed the issue.  See MacIntyre v. JP Morgan Chase Bank, No. 12-CV-2586-WJM-MEH, 2015 WL 1311241, at *2 (D. Colo. Mar. 19, 2015)(Blackburn, J.)("Thus, the Court agrees with Plaintiff that *Sprint* significantly cabined the breadth of *Younger* abstention as it has been applied in this circuit."); Brumfiel v. U.S. Bank, N.A., No. 14-CV-2453-WJM, 2014 WL 7005253, at *3 (D. Colo. Dec. 11, 2014)(Martinez, J.)("[I]n *Sprint,* the Supreme Court reversed a decision by the Eighth Circuit Court of Appeals that applied *Younger* abstention using substantially the same analysis as in [Amanatullah v. Colo. Bd. of Med. Examiners][.]"); Conry v. Barker, No. CV14CV02672CMAKLM, 2015 WL 5636405, at *6 (D. Colo. Aug. 11, 2015)(Mix, M.J.).

The first two categories of cases are irrelevant here.  There is no criminal case, and the underlying proceedings were not "initiated to sanction the federal plaintiff, *i.e.,* the party challenging the state action, for some wrongful act."  Sprint, 134 S. Ct. at 592.  The third category, "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions," is not clearly defined.  Sprint, 134 S. Ct. at 588.  Neither party has made any arguments based on Sprint.  See Brumfiel v. U.S. Bank, N.A., 2014 WL 7005253, at *3 ("[N]either party has provided any support for such a finding. Accordingly, the Court finds that, following *Sprint, Younger* abstention does not apply to this case.").  Sprint cited cases involving state contempt proceedings and the procedure used to obtain a state court judgment.  See Conry v. Barker, 2015 WL 5636405, at *7 (citing Juidice v. Vail, 430 U.S. 327, 336 n.12 (1977) and Pennzoil Co. v. Texaco Inc., 481 U.S. 1, 13 (1987)).  This case does not involve any state court orders or similar issues.  The Court thus concludes that Younger abstention does not apply.

## C.   THE COURT WILL NOT DECLINE TO EXERCISE JURISDICTION UNDER THE DECLARATORY JUDGMENT ACT.

The Federal Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a) (emphasis added).  "By the Declaratory Judgment Act, Congress sought to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants."  Wilton v. Seven Falls Co., 515 U.S. at 288.

The Tenth Circuit has adopted a five-factor test for evaluating whether a district court should exercise its discretionary jurisdiction over a declaratory judgment action:

> [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race to res judicata"; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.

St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d at 1169 (brackets in original).

The Court will not decline to exercise jurisdiction under the Declaratory Judgment Act for three primary reasons. First, Gerhardt seeks more than just declaratory relief. See Complaint ¶ 124, at 17; Valdez v. Metro. Prop. & Cas. Ins. Co., 867 F. Supp. 2d 1143, 1155 (D.N.M. 2012)(Browning, J.)(declining to exercise jurisdiction given a plaintiff's request for injunctive relief); Kanciper v. Suffolk Cty. Soc. for the Prevention of Cruelty to Animals, Inc., 722 F.3d 88, 93 (2d Cir. 2013)("Wilton [v. Seven Falls Co.] does not apply where, as here, a plaintiff does not seek purely declaratory relief, but also . . . seeks damages caused by the defendant's conduct.")(internal quotations omitted). Second, the declaratory action would not settle this controversy. See Tr. at 110:17-20 (Court)("[T]he declaratory judgment doesn't stop the case, because they're still seeking damages, so there would be no reason to abstain there or to decline to exercise jurisdiction there."). Third, the possibility of friction between state and federal courts factor is neutral. There is a pending, parallel state proceeding. See Valdez v. Metro. Prop. & Cas. Ins. Co., 867 F. Supp. 2d at 1192. The Tenth Circuit has found a district court's "dismissal of a declaratory judgment action an abuse of discretion because there was no pending state proceeding whatsoever." United States v. City of Las Cruces, 289 F.3d 1170, 1183 (10th Cir. 2002). On the other hand, the proceeding mentioned in St. Paul Fire and Marine Ins. Co. v. Runyon, was a state court proceeding rather than an administrative proceeding. See 53 F.3d at

1169.  Overall, the Declaratory Judgment Act thus does not suggest that the Court should decline to hear Gerhardt's claims.

### D.   THE RACING COMMISSIONERS, BUT NOT THE EXECUTIVE DIRECTOR AND STEWARD, ARE ENTITLED TO ABSOLUTE QUASI-JUDICIAL IMMUNITY.

The Tenth Circuit recognizes that "officials in administrative hearings can claim the absolute immunity that flows to judicial officers if they are acting in a quasi-judicial fashion." Guttman v. Khalsa, 446 F.3d at 1033 (citing Butz v. Economou, 438 U.S. at 514).  For an official at an administrative hearing to enjoy absolute immunity, "(a) the officials' functions must be similar to those involved in the judicial process, (b) the officials' actions must be likely to result in damages lawsuits by disappointed parties, and (c) there must exist sufficient safeguards in the regulatory framework to control unconstitutional conduct."  Guttman v. Khalsa, 446 F.3d at 1033 (quoting Horwitz v. State Bd. of Med. Examr's, 822 F.2d 1508, 1513 (10th Cir. 1987))(internal quotation marks omitted).  The Court concludes that quasi-judicial immunity shields the Racing Commissioners from the Plaintiffs' claims for damages.  The Racing Commissioners' functions here are similar to those of judges in a judicial process.  Their decisions are highly likely to cause litigation.   Finally, the regulatory scheme contains sufficient safeguards to prevent unconstitutional conduct.

First, the Racing Commissioners' functions are similar to those involved in the judicial process.  As in Simon v. Taylor, the Racing Commissioners appointed a hearing officer "to recommend a disposition of a particular dispute," the hearing officer conducted a hearing based on evidence, and the hearing officer provided a recommendation. 981 F. Supp. 2d at 1062.  The Racing Commissioners have remanded the Initial Recommendation, and will ultimately review and act on any resulting changes.  See 981 F. Supp. 2d at 1062.  "In this sense, the Racing

Commissioners are similar to the Administrative Prosecutor and the individual who presided over the three-day hearing in front of the New Mexico Board of Medical Examiners in Guttman v. Khalsa, to whom quasi-judicial immunity applied." Simon v. Taylor, 981 F. Supp. 2d at 1062. Gerhardt argues that the situation is different, because "any confidence in decisions -- or lack of decisions -- reached by the Commission is utterly lacking." Commission Response at 11. This argument overlooks the underlying rationale for the immunity:

> [T]he Plaintiffs' dissatisfaction with the manner in which the Racing Commission carried out its role in this case cannot transform the Racing Commission's otherwise clearly judicial functions into non-judicial functions. If the judicial process prong examined the way judges behaved in a particular case, that would vitiate the core principle of judicial immunity[.]

Simon v. Taylor, 981 F. Supp. 2d at 1062. Gerhardt's arguments inappropriately focus on the Commission's behavior in this particular case. Gerhardt's ability to appeal the Racing Commissioners' decision to the state courts, and ultimately the Supreme Court of New Mexico and the Supreme Court of the United States, also indicates that the Racing Commission is acting in a judicial function. See Tr. at 87:12-22 (Court, Richards).

The test's second prong also favors quasi-judicial immunity. The Court's reasoning in Simon v. Taylor applies with equal force:

> [B]ecause the Racing Commission has wide-ranging authority over the lucrative horse racing industry, its acts are likely to provoke lawsuits by disappointed parties-in-interest. This case is evidence of that conclusion: because any decision that the Racing Commission made would have substantial economic consequences for some players in the industry, its decision would give those players reason to sue.

Simon v. Taylor, 981 F. Supp. 2d at 1063. The relatively large number of lawsuits in the District of New Mexico related to the Commission's actions reinforces the Court's conclusion on this point.

Third, Gerhardt has failed to distinguish the procedural safeguards applicable here from the safeguards present in Simon v. Taylor.  Gerhardt cites the Racing Commissioners': (i) decision to hold closed meetings; (ii) decision to take the matter under advisement; (iii) failure to follow their own regulations; (iv) failure to provide pre-deprivation notice or other process; and (v) unexplained remand as evidence that the Racing Commissioners do not provide sufficient procedural safeguards.  See Commission Response at 12-14.  As in Simon v. Taylor, however, the regulations themselves provided sufficient constitutional safeguards.  See 981 F. Supp. 2d at 1063.  Gerhardt's real issue is with how the Racing Commissioners applied the relevant regulatory framework to his case.  See 981 F. Supp. 2d at 1063.

> This argument, however, . . . fails on the third prong for the same reason it failed on the first prong: the facts asserted do not respond to the test applied.  The test asks whether the regulatory framework contains sufficient safeguards to control unconstitutional conduct and not whether a particular administrative tribunal in a particular case engaged in allegedly unconstitutional conduct.

981 F. Supp. 2d at 1063.

Gerhardt also argues that sufficient procedural safeguards are lacking, because injunctive relief "is not sufficient to provide a remedy or relief to Plaintiff in this circumstance, even if Plaintiff could pursue such route."  Commission Response at 14.  Even assuming that injunctive relief is not sufficient for Gerhardt, the relevant regulatory framework provides identical relief to the relief declared sufficient in Simon v. Taylor.  See 981 F. Supp. 2d at 1064.

The Court's decision regarding the Racing Commissioners could change if they cease acting like judges in this case and begin to act like rulemakers and regulators, or even as prosecutors.  If the Racing Commissioners start changing the regulations, rather than applying them to the facts, the Court is likely to find that they are acting as rulemakers rather than as judges.  See Simon v. Taylor, 981 F. Supp. 2d at 1062 (relying on the fact that "the Racing

Commissioners reviewed the findings of the Hearing Panel and disposed of its recommendation"). It is true that, if they continue to defer any action and never get around to acting as judges, they will prevent state courts from reviewing their decision. They could thus prevent the relevant regulatory framework from providing sufficient safeguards to control unconstitutional conduct. See Simon v. Taylor, 981 F. Supp. 2d at 1063. But they have not done that yet, and the Court cannot make its quasi-judicial immunity decision on the basis of what might happen. It has to make it on the allegations actually made. The Racing Commissioners' timing, in other words, could eventually undermine the Court's analysis of whether there are enough safeguards in the regulatory framework to control possible unconstitutional Racing Commission conduct, and thus cast doubt on the Court's decision whether the Racing Commission Defendants are entitled to quasi-judicial immunity. The Court has to make that decision now, here, and on the current allegations, they are entitled to quasi-judicial immunity. The Commissioners would be wise to act like judges and make their decisions in a timely fashion. If they do not, they may be subject to state mandamus proceedings in this case, and another federal case may find that they are not acting like judges at all, and not recognize quasi-judicial immunity.

Keiter and Mares, on the other hand, are not entitled to quasi-judicial immunity. The Court has "drawn distinctions between when a person is acting in a judicial role, such that they are entitled to quasi-judicial immunity, and when a person in a quasi-judicial setting plays a merely ministerial role." Simon v. Taylor, 981 F. Supp. 2d at 1054. This distinction rests on the defendant's "participation in the deliberative process and [] exercise of independent judgment." Simon v. Taylor, 981 F. Supp. 2d at 1055. There is no evidence that either Keiter or Mares participated in the deliberative process or exercised independent judgment. The Racing

Commissioners described the steward as performing the "front line application of the rule" and handling an "initial adjudication of facts." Tr. at 98:15-99:9 (Howell). These roles seem similar to those of a police officer -- the officer's role is ministerial and mechanical compared to the Racing Commissioners' role in the disputed events. See Tr. at 101:21-24 (Court).

## IV.    THE RACING COMMISSION DEFENDANTS ARE IMMUNE FROM GERHARDT'S STATE LAW CLAIMS.

Gerhardt's third cause of action brings a prima facie tort claim against Keiter, Mares, and the Racing Commissioners. See Complaint ¶¶ 96-98, at 12. This claim fails for two reasons. First, New Mexico has not waived immunity for prima facie tort claims against its employees.

> Governmental entities and public employees, while acting within the scope of duty, are granted immunity from liability from tort except as waived by the specific provisions of the Tort Claims Act. NMSA 1978, § 41-4-4(A) (1976, prior to 2001 amendment). Defendants Livestock Board and Director Wortman come within the definitions of "governmental entity" and "public employee." See NMSA 1978, § 41-4-3(B), (F) (1995). Prima facie tort is not included in the specific provisions of the Tort Claims Act and, therefore Defendants enjoy immunity from Plaintiff's claim. See NMSA 1978, §§ 41-4-5 to -12 (1976, as amended through 1991).

Derringer v. State, 2003-NMCA-073, ¶ 16, 68 P.3d 961, 965. Second, Gerhardt has not overcome this obstacle by alleging that any of these Defendants acted outside the scope of their duties. The Complaint does not contain any allegations supporting this argument. Given this failure, the Defendants had no responsibility "to present factual information or evidence by way of affidavit to establish that each Defendant was acting within the scope of his duties when he took the actions complained of by Plaintiff's prima facie tort claim for relief." Commission Response at 20. The argument in the Commission Response also misses its mark. Even "unauthorized" or "criminal" acts may fall within the scope of these Defendants' duties. Risk Mgmt. Div., Dep't of Fin. & Admin., State v. McBrayer, 2000-NMCA-104, ¶¶ 14, 19, 14 P.3d 47-49. These Defendants' actions -- interpreting and enforcing the Breed Certificate Rule,

reviewing the situation, and generally handling Gerhardt's challenge -- are very different from the case of a teaching assistant who rapes a student on campus.  See Risk Mgmt. Div., Dep't of Fin. & Admin., State v. McBrayer, 2000-NMCA-104 at ¶ 29, 14 P.3d at 51.

Although Gerhardt's briefing is not clear on this point, he may have also asserted state law conspiracy claims against various Defendants.   See Complaint ¶¶ 99-124, at 13-17; Commission Response at 18-19.  Any state law conspiracy claims fail for the same reasons that the prima facie tort claims fail.  "New Mexico courts have also recognized the there is no waiver of liability for civil conspiracy in the NMTCA."  Salazar v. City of Albuquerque, No. CIV 10-0645 JB/ACT, 2013 WL 5554185, at *41 (D.N.M. Aug. 20, 2013)(Browning, J.).  In Seeds v. Lucero, 2005-NMCA-067, 113 P.3d 859, the Court of Appeals of New Mexico dismissed claims against a mayor and city attorney for allegedly conspiring with other defendants to cause personal and financial harm to the plaintiffs and their towing businesses.  See 2005-NMCA-067, ¶1, 113 P.3d at 860.  The mayor and city attorney argued that the NMTCA did not waive their immunity for civil conspiracy claims.  See 2005-NMCA-067, ¶ 6, 113 P.3d at 861.  The Court of Appeals of New Mexico agreed, concluding that a "public employee's conspiratorial and wrongful intent does not remove the employee's immunity when the employee's acts are within the scope of his or her duties."  2005-NMCA-067, ¶ 16, 113 P.3d at 863.  Given the Court's conclusion that the Defendants did not act outside their duties' scope, the Court holds that the Defendants are immune under the NMTCA from any state law civil conspiracy claims.

In conclusion, the Court dismisses all claims against Woods with prejudice, because there was no constitutional violation and the law was not clearly established.   The Racing Commissioners, but not Mares or Keiter, are entitled to quasi-judicial immunity because they act in a quasi-judicial fashion on the facts present here.  The Court thus dismisses the federal claims

against the Racing Commissioners with prejudice.  The Court concludes that Gerhardt's claims against the Commissioners, Mares, and Keiter are not yet ripe.  It thus dismisses the federal claims against Mares and Keiter without prejudice.  Finally, sovereign immunity and the NMTCA bar Gerhardt's state claims against the Commissioners, Mares, and Keiter.  The Court thus dismisses these claims with prejudice.

**IT IS ORDERED** that: (i) the Plaintiff's Motion for Leave to File Sur-Reply to Defendant Woods' Reply in Support of Motion to Dismiss, filed November 24, 2015 (Doc. 38), is granted; (ii) Defendant Roscoe Woods' Motion to Dismiss Amended Complaint, filed October 16, 2015 (Doc. 29), is granted; (iii) the Racing Commission Defendants' Motion to Dismiss, filed October 28, 2015 (Doc. 31), is granted; (iv) Gerhardt's federal claims against Vincent Mares and David Keiter are dismissed without prejudice; and (v) all of Gerhardt's other claims are dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

A. Blair Dunn
Dori Ellen Richards
Western Agriculture, Resource and Business Advocates, LLP
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Walter J. Melendres
Carolyn A. Wolf
Trent A. Howell
Montgomery & Andrews, PA
Santa Fe, New Mexico

*Attorneys for Defendants Vincent Mares, New Mexico Racing Commission, David Keiter, Robert M. Doughty, III, Beverly Bourguet, Jerry Cosper, Gayla D. McCulloch, and Ray Willis*

Hector Balderas
   Attorney General of the State of New Mexico
Ari Biernoff
   Assistant Attorney General
New Mexico Attorney General's Office
Santa Fe, New Mexico

*Attorney for Defendant Roscoe Woods*